FILED

2017 Jan-13  AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| **ARTURO J. OTERO,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-7:14-BE-2253-W** |
| | ] | |
| **UNUM LIFE INSURANCE COMPANY** | ] | |
| **OF AMERICA,** | ] | |
| | ] | **UNDER SEAL** |
| **Defendant** | ] | |
| | ] | |

## MEMORANDUM OPINION

"Financial protection for what matters most" appears on the website of the Defendant, Unum Life Insurance Company of America.  Its vision statement includes providing products that help "employees protect their families and livelihoods," and its statement of values places integrity above all others.[1]

In this ERISA lawsuit, the Plaintiff, Dr. Arturo Otero, asserts, in essence, that Unum failed to live up to its own motto and statements of values and vision when it failed to act with integrity by denying him the financial protection for which he paid.  He claims disability benefits under a group long-term disability policy issued to his employer.  He argues that Unum waived any right to declare him ineligible for coverage based on his part-time work, because it knew he was working part-time when it accepted his premiums, and failed to follow the mandated claims procedures in processing his current claim.

---

[1] www.unumgroup.com

1

This case raises two issues that the Eleventh Circuit has not yet resolved:  whether waiver applies in an ERISA context in circumstances present here, and whether the correct standard of review is *de novo* in a "deemed exhausted" ERISA case when the insurance company has not exercised the discretion granted it by the plan.

This matter is before the court on cross motions for judgment on the administrative record: "Plaintiff's Motion for Summary Judgment" (doc. 21), converted to a Motion for Judgment on the Administrative Record (doc. 30), with an accompanying brief (doc. 22); and "Unum Life's Motion for Judgment on the Administrative Record, or Alternatively, for Summary Judgment" (doc. 23), with an accompanying brief (doc. 24).  The parties responded to the cross motions (Unum's response - doc. 34; Plaintiff's response - doc. 36), so this matter has received thorough briefing.

For the reasons stated in this Memorandum Opinion,[2] the court DEEMS these motions to be requests for judgment as a matter of law, not judgment limited to the administrative record; the court FINDS that Dr. Otero is eligible for coverage under the group policy and FINDS that he cannot perform the material and substantial duties of his regular occupation as a neurologist. However, the court WILL REMAND this case to Unum, directing it to request from Dr. Otero the relevant W-2 forms and to make appropriate calculations based on the W-2 forms to determine whether Dr. Otero's monthly earnings after February 2, 2013 decreased by 20 % as required to qualify as a disability under the policy.

---

[2] As discussed on pages 37-38 in this Memorandum Opinion, the parties submitted materials outside the administrative record, and this court considered them on *de novo* review.

## I.  PROCEDURAL BACKGROUND

Dr. Arturo J. Otero is a licensed neurologist who is not board certified.  This case represents the second case he has filed against Unum, claiming disability benefits under the group long-term disability policy that Unum issued to his employer, Neurology Consultants of Tuscaloosa, P.C.  To distinguish between the two related lawsuits, the court will refer to the first case filed, *Otero v. Unum Life Ins. Co.,* Case No. 7:10-CV-02554-SLB (N.D. Ala.), as "*Otero I*"; and will refer to the instant case as "*Otero II.*"  An understanding of *Otero I* sheds light on the circumstances of this suit.

ERISA governs both the original claim made the basis of *Otero I* and the one made the basis of the current suit.  (29 U.S.C.A. §§ 1001 to 1461).  Before 2005, Dr. Otero had worked 60-80 hours per week as a neurologist, seeing patients in the office and hospital and taking night call. (*Otero I,* Doc. 35-14, at 74).  Prior to filing the first lawsuit, Dr. Otero filed a claim with Unum for disability benefits beginning January 3, 2005, when he stopped working on a full-time basis because of atrial fibrillation.  Dr. Otero continued to work as a neurologist on a part-time basis with no night call.  (*Otero II,* Doc. 35-3, at 3).

Unum  provided Dr. Otero with full disability benefits of $10,0000 per month for 24 months beginning April 3, 2005 (*id.* at 3 & 5) based on policy provisions that provided for benefits with a determination that the employee was "limited from performing the material and substantial duties of [his] regular occupation due to sickness or injury and [that he has] a 20% or more loss in [ ] indexed monthly earnings due to the same sickness or injury."  (*Otero II,* Doc.

25-1, Ex. 2[3]; Doc. 25-2, at 19).   The company's determination to provide benefits at this juncture was based on Dr. Otero's reported restriction of being unable to perform night call, a substantial duty of his job.  (*Otero I*, Unum Opp. Br., Doc. 31, at 3 ¶ 12 (resp. to "undisputed" fact 12.)).

    After that two-year period, the eligibility for benefits under the policy changed from the determination of whether the employee could perform his "regular occupation" to whether he was "unable to perform the duties of any gainful occupation for which [he] is reasonably fitted by education, training or experience." (*Otero II,* Doc. 25-1, Ex. 2; Doc. 25-2, at 19; Doc. 35-3, at 3)*.* The policy defines gainful occupation as one that would provide the claimant with an income "at least equal to your gross disability payment within 12 months of your return to work."  (*Otero II,* Doc. 25-2, at 37).

    On September 28, 2007, more than 29 months after the April 2005 commencement of disability payments to Dr. Otero, Unum terminated his benefits. Although the policy's disability benefit was now based on the "any gainful occupation" standard, Unum terminated benefits because it found that Dr. Otero could perform the full-time duties required of his regular occupation as a neurologist, including working the necessary hours and taking rotational night call. (*Otero I,* Doc. 35-13, at 70-74).

    Dr. Otero appealed that decision, and, after review, Unum reversed the decision and reinstated Dr. Otero's disability benefits on January 17, 2008.  That reinstatement letter quoted various policy provisions, and quoted the definition of "regular occupation" but not "gainful occupation."  Ultimately, the letter notifying of the reversal stated simply that the additional

---

[3] Although the court would prefer to cite to the specific page of the record, because Unum refiled a document filed in the previous case, the page number that would normally appear is stamped over by the multiple filings.

information from Dr. Otero's treatment providers "was reviewed by our physician and restrictions and limitations were found to be supported." (*Otero I*,  Doc. 35-14 at 14-17, 19).

According to Unum's response to Dr. Otero's statement of facts in *Otero I*, which it adopts in *Otero II*, Unum based its reversal decision on the need for more information concerning Dr. Otero's restrictions and limitations in his occupation, including an independent medical exam. (*Otero I,* Doc. 31, at 3-4 (responding); *Otero II,* Doc. 34, at 4 (adopting)). However the letter itself did not qualify the reversal or say that the reversal was based on the need for more medical information.  It did say that, in the future, the benefits center "will also require periodic updates of your medical status to determine if you remain eligible for continued benefits under the applicable policy provisions."  (*Otero I*, Doc. 35-14, at 17).

A document entitled "Appeal Reversal" in Unum's file on Dr. Otero provided a rationale for the appeal decision that the letter itself failed to provide: the Appeal Reversal document focused on Dr. Otero's pre-disability lengthy work hours and his report of sleep deprivation triggering heart palpitations.  Dr. Parisi, the medical reviewer, noted that Dr. Kay, Dr. Otero's cardiologist, had consistently restricted Dr. Otero from working night call, a restriction with which Dr. Parisi could not disagree.  That same Appeal Reversal document noted that vocational reviewer Catherine Rogers had previously found night call to be a substantial and material duty in the occupation of neurologist.  Although vocational reviewer Shannon O'Kelley found that night call could or could not be a substantial and material duty because some neurologists are not required to do night call, O'Kelley did agree that lack of night call would result in a decline in income.  (*Otero I,* Doc 35-14, at 24).

Unum paid disability benefits to Dr. Otero of $10,000 per month for two additional years

from January 2008 to March 4, 2010.  On June 12, 2008, an independent medical doctor evaluated Dr. Otero and determined that he would be able to practice as a neurologist without night call or weekend call.  (*Otero I*, Doc. 35-22, at 149).   In a January 2010 telephone conversation with Unum staff, Dr. Otero advised Unum that he was working as a neurologist and general medical practitioner for about 20 hours per week, performing office-based clinical work for four hours per day and seeing a limited number of patients, but not performing night call or hospital call.  (*Otero II*, Doc. 35-3, at 3).

Once again, on March 4, 2010, Unum Lead Disability Benefits Specialist Andrew Hamilton sent Dr. Otero a letter terminating his benefits.  In that letter, Unum noted his part-time work as a neurologist and stated that, although the medical data in his file did "not support [his] reported inability to work 40 hours per week," the data "supports the restrictions and limitations of no night call, weekend call, and hospital work or hospital procedures."  Unum concluded that Dr. Otero was not disabled under the "any gainful occupation" standard because he had transferable skills that would allow him to earn $10,000 per month as an Insurance Physician (working 40 to 67 hours per month or approximately 10 to 16 hours per week to receive an income equal to $10,000 per month), Medical File Review Physician (same), or Peer Review Physician (working 22 ½ to 31 hours per month or approximately 5.5 to 7.6 hours per week to receive an income equal to $10,000 per month).  (*Otero II,* Doc. 35-3, at 2-5).  Unum reached that conclusion, in part, because of the vocational review completed on March 2, 2010.  In that report, the reviewer opined that Dr. Otero was qualified to perform the work in those three identified jobs, and she did not discuss board certification as a qualification.  (*Otero I,* Doc. 35-22, at 143-45).  Thus, Unum based this determination that Dr. Otero was not entitled to long-

term disability benefits upon a determination that he was able to perform a "*gainful occupation*,"

not upon a determination that he was able to perform his "*regular occupation*" as a neurologist.

(*Otero I*, Doc. 35-22, at 147-150; Doc. 35-23, at 1-3, & 5).

Dr. Otero appealed that ruling administratively, and, in a letter dated April 30, 2010,

Unum Lead Appeals Specialist Robert Spellman acknowledged that Unum's own consulting

physician agreed with part-time work restrictions for Dr. Otero "based on the fact that full time

work would increase [his] bouts of atrial fibrillation."  However, Unum determined that

termination of benefits was correct because Dr. Otero would perform other gainful employment

on a part-time basis.   (*Otero I,* Doc. 35-23, at 105).  That letter gave Dr. Otero until May 30,

2010 to provide additional information, and stated that, if Unum did not receive additional

information, the decision would be final.  The letter also advised Dr. Otero of his right to bring a

civil suit under § 502(a) of ERISA if he disagreed with the decision.  (*Otero II*, Doc. 35-4).

The administrative record in *Otero I* reflected that Dr. Otero submitted a letter dated May

24, 2010 along with a letter from his cardiologist, Dr. Kay, dated May 20, 2010.  Dr. Kay's letter

stated in part:

> [Dr. Otero] has repeatedly shown that when he increases his work load that
> atrial fibrillation becomes a major problem for him.  Thus, it is my opinion that
> Dr. Otero's current work load status is optimal for his cardiac condition.  He
> presently attends as a practicing neurologist in an outpatient clinic setting over
> seeing low complex cases in a limited fashion.  Asking Dr. Otero to carry out
> the job description as suggested in your [termination of benefits] letter would be
> far more stressful to him and can be expected to cause him to have more atrial
> fibrillation.  In order for him to carry out the duties as you described would
> require additional training for him as he does not have expertise in these
> matters.  I believe that this markedly increases his risk of atrial fibrillation and
> would hinder his health and well being . . . . My recommendation since 2007
> [has] not changed and I would strongly encourage that his present level of work
> duties not be changed.

(*Otero I,* Doc. 35-23, at 119).  Mr. Spellman responded to that information with a letter dated

May 26, 2010, acknowledging receipt of that information and stating "we have completed our

appellate review and our decision was communicated to you by letter dated April 30, 2010.  If

you wish to request a re-appeal of your claim, we would need a request in writing."  (*Otero I,*

Doc. 35-23, at 121).

In *Otero I*, Dr. Otero appealed Unum's 2010 decision terminating benefits by filing a civil

suit in this court.  By final judgment of March 30, 2012, the court granted judgment on the

administrative record in Unum's favor, and denied Dr. Otero's motion.  It found that the

information in the administrative record did not support a finding that Unum's decision was

wrong when Unum concluded that actual jobs existed that would pay Dr. Otero $10,000 per

month, and thus, that he was not disabled under the "any gainful occupation" standard.  At the

district court level, Dr. Otero argued that he was not qualified for the jobs that the VE identified

because he is not board certified in neurology, and, to establish that fact, relied on evidence that

was not in the administrative record.   The court granted the motion to strike the evidence outside

the administrative record.  Considering only the material available to Unum when it made its

determination, the court concluded: "[a]lthough plaintiff has argued that the VE's report is

inaccurate, nothing in the administrative record indicated that defendant had any reason to know

or suspect that VE's report was inaccurate and that plaintiff could not perform the jobs as

reported by the VE."  (*Otero* I, Doc. 36, at 5).  Dr. Otero did not appeal that judgment against

him.  (*Otero II,* Unum's Br. Doc. 24, at 7-undisputed fact #11; Doc. 36, at 4-no dispute).

### III.  FACTS

In *Otero II,* Dr. Otero argues that Unum accepted his premiums under the group long-

term disability policy from April of 2010 forward,  knowing that he was working part-time, and thus, it has waived any right to deny that he was not eligible for coverage because of his failure to work the minimum hours.   Dr. Otero also argues that, as of February of 2013, he once again became disabled within the meaning of the group policy because of the deterioration of the same condition of atrial fibrillation.  Comparing the 2013 claim with his prior claim, as discussed in detail below, the 2013 claim focuses on the same condition (atrial fibrillation) for a different time period (beginning February of 2013 versus the prior claims's disability commencement date of 2005 with a different disability standard applying after two years of payments) using a different disability standard ("regular occupation" standard versus the prior claim's "any gainful occupation" standard).

On the other hand, Unum asserts that Dr. Otero is not eligible for coverage because of his part-time work and that Unum did not waive the 36-hour eligibility restriction because Unum did not know that Dr. Otero was not working the minimum number of hours until he submitted a claim.  Further, Unum argues that, even if Dr. Otero were eligible for coverage, the decision to deny his claim for disability was not wrong because he is able to perform his regular occupation as a neurologist and because he did not receive a 20% or more loss in his indexed monthly earnings because of his atrial fibrillation.  In light of those arguments, the following facts are relevant and material.

### A.  Factual Narrative

After the termination of his group disability benefits in March of 2012, Dr. Otero continued to work part-time as a neurologist.  He asserts that, by February of 2013, his condition had so deteriorated that he was once again disabled within the meaning of his policy.

9

*Dr. Otero's Ability to Perform His "Regular Occupation"*

The evidence reflects that Dr. Otero's regular occupation is neurologist, and his Unum policy provides that Unum measures whether he can perform that regular occupation by how the occupation is "normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Otero II*, Doc. 25-2, at 25). While the briefing does not clearly list all the duties of a neurologist as that job is performed in the national economy, the evidence does reflect that such job would require working full-time, as opposed to part-time hours, and some of the evidence supports the inclusion of night call as part of those duties. Catherine Rogers, Unum's Senior Vocational Consultant, found night call to be a substantial and material duty in the occupation of neurologist. Another Unum Senior Vocational Rehabilitation Consultant, Shannon O'Kelley, found that night call could or could not be a substantial and material duty of the neurologist occupation, although a neurologist who did not take night call would expect decreased income. (*Otero I,* Doc. 35-14, at 8, 12, 24). Marilyn Howard of Unum stated in her note to Dr. Otero's claims file dated January 10, 2008 that "all statements indicate the insured would need to work over 40 hours per week to perform full duties." (*Otero I,* Doc. 35-14, at 11-12).

Dr. Otero suffers from chronic atrial fibrillation that generally occurs with factors such as stress, anxiety, and lack of sleep. (*Otero II,* Doc. 35-15, at 45). One of his cardiologists, Dr. William Hill, characterized his symptoms as "very severe and incapacitating to the point that he is unable to sustain any type of full time job. . . . [H]is clinical descriptions with his symptoms of weakness, shortness of breath, and inability to function during and after his episodes are quite consistent with the medical literature [and] there really is no question in my mind that based on

10

the above, he is unable to carry on any meaningful sustained job."[4]  (*Otero II,* Doc. 35-15, at 45 & 46).  In addition to Dr. Hill, Dr. Otero has been under the care of cardiovascular electrophysiologists, first Dr. Neal Kay, and, after he retired, Dr. Jose Osorio, both practicing in Birmingham.

The seriousness of Dr. Otero's condition is reflected in the need to have medical procedures to restore his heart rhythm.  Even when working part-time in the office setting to decrease the factors associated with atrial fibrillation, Dr. Otero has required several cardioversion[5] and two ablation[6] procedures to place his heart back into a sinus rhythm.

The current claim for disability allegedly began in February of 2013 and represented a further deterioration of his heart condition.  On February 2, 2013, Dr. Otero underwent a cardioversion procedure at DCH Regional Medical Center in Tuscaloosa, which successfully reestablished a sinus rhythm, and another on October 20, 2013. (*Otero II,* Doc. 35-15, at 32, 41, 55, 59 & 62).  On January 16, 2014, Dr. Osorio stated that Dr. Otero had been hospitalized on December 4 and 5, 2013, for implementation of a new medical therapy involving a beta-blocker called Sotalol HCL to treat his atrial fibrillation.  He stated that Dr. Otero "will need to continue leading a non-stressfull [sic] life and work part-time in a non-stressful environment, preferably

---

[4] While Dr. Hill stated this opinion in 2010, no evidence reflected that Dr. Otero's condition has improved since then, and, in fact, evidence reflected that his condition has since deteriorated.

[5] Cardioversion is a procedure using a therapeutic dose of electric shock to convert an abnormal rhythm to a sinus rhythm.

[6] Cardiac ablation is a procedure that places a flexible tube into a blood vessel that is guided to the heart and uses heat, cold or radio energy to scar some tissue inside the heart where irregular beats are triggered.

11

less stressful than what he works in now in order to help decrease the symptoms of his afib." (*Otero II,* Doc. 35-15, at 39.)

Prior to the 2013 claim on appeal here, Unum had never made a final determination that Dr. Otero was able to perform his "regular occupation." Unum paid him long-term disability benefits for years when the definition of "disability" under the policy was measured under the "regular occupation" standard, and the 2010 determination that he was *not* entitled to long-term disability benefits was based upon a determination that he was able to perform a "*gainful occupation*," not upon a determination that he was able to perform his "*regular occupation*" as a neurologist. (*Otero I*, Doc. 35-22, at 147-150; Doc. 35-23, at 1-3, & 5).

### Unum's Knowledge of Dr. Otero's Part-Time Work

Unum's complex history with Dr. Otero—involving numerous disability benefits determinations, administrative appeals, and two years of litigation in federal district court, all before the denial of the current claim—meant that the company had much information available to it about Dr. Otero's part-time work schedule.  In *Otero I,* the court entered judgment in Unum's favor in March of 2012.  The information in *Otero I*'s administrative record reflected that, after filing claims for disability benefits, Dr. Otero worked part-time as a neurologist from 2005 through the approximate date of the 2010 decision, working four hours a day and sixteen to twenty hours a week, seeing patients in the office. (*Otero I*:  Doc. 35-14, at 7; Doc. 35-22, at 66; Doc. 35-23, at 6-7 ).  The decision makers on his March 2010 disability benefits termination and the April 2010 administrative appeal, Andrew Hamilton and Robert Spellman respectively, reviewed materials repeatedly referring to Dr. Otero's part-time work hours, and those decision makers repeatedly acknowledged his part-time work hours in their claim file documents in March

12

and April of 2010.   (*Otero I*: Doc. 35-23, at 6, 23, 25, 29, 31, 48, 51, 54).

On March 26, 2010, Dr. Otero sent Andrew Hamilton a letter, advising him that he was pursuing an administrative appeal of the termination of his long term disability benefits.  In that letter, Dr. Otero specifically asked for "clarification as to what is the current status of my group policy for any premiums due or does the waiver of the premiums still apply to this policy while the appeal is in process."  (*Otero I*: Doc. 35-23, at 22).  The same March 26, 2010 letter also contained confirmation that Dr. Otero was working part-time; it attached two letters from Dr. Otero's cardiologists, both dated in early 2010 and setting out his work schedule of four hours a day and twenty hours a week.  (*Otero I*: Doc. 35-23, at 23-26). Unum assigned the appeal to specialist Robert Spellman.

The administrative record reflects that Dr. Otero resumed paying premiums after termination of his benefits with the knowledge of and based on the direction of Unum decision maker Robert Spellman.  Dr. Otero wrote to Unum, asking whether he needed to pay premiums during the appeals process, and he and his staff called Unum repeatedly from March 24 through April 1, 2010 to obtain an answer to that question; Dr. Otero and his staff left messages with Robert Spellman, and the decision maker on his March 2010 termination, Andrew Hamilton, among others.  (*Otero I*: Doc. 35-23, at 18, 28, 36, 38, 39).  Robert Spellman created the following notation in the claims file dated April 2, 2010: "Spoke to [Dr. Otero.] I noted that he should continue to pay premiums while his appeal is being reviewed as to avoid a lapse in coverage. [Dr. Otero] said he would continue."  (*Otero I*: Doc. 35-23, at 41).

Days before and after he gave that advice to Dr. Otero about resuming payment of premiums, Mr. Spellman received documents referring to Dr. Otero's part-time work status and

created documents in which he himself referred to Dr. Otero's part-time work status:

• March 29, 2010: Mr. Spellman sent a letter to Dr. Otero acknowledging receipt of his written notice of appeal; that appeal notice attached letters from Dr. Otero's cardiologists, both referring to his part-time work status. ( *Otero I*: Doc. 35-23, at 20, 22, 23, & 25).

• April 7, 2010: Mr. Spellman spoke with Dr. Otero over the phone, and Spellman's notation of the phone call states: "He continues to work on a PT [part-time] basis in the same hours and has not applied for [social security disability income] as he has been working pt [part-time]. (*Otero I*: Doc. 35-23, at 48).

• April 8, 2010: Mr. Spellman acknowledged Dr. Otero's part-time work status in a file document, noting that in 2005 he had returned to work "part time . . . working appx 25-30 hours per week," and that Dr. Otero was arguing "that he remains unable to work full time in other gainful occupations." (*Otero I*: Doc. 35-23, at 51, 54).

• April 12, 2010: a Clinical Consultant Resource file entry by Karen York duplicated the information quoted above for the April 8 entry and quoted the information from Dr. Otero's cardiologists that, as of February 2010, Dr. Otero "[h]as to divide his schedule into 2 hours in the morning and 2 hours in the afternoon . . . . He clearly reports a major problem with working more than 20 hours per week." (*Otero I*: Doc. 35-23, at 54-57).

• April 15, 2010: Doctor Resource file entry, created by Karen York for referral to Dr. Alfred Parisi, again recounted Dr. Otero's cardiologists' explanation of Dr. Otero's part-time work and part-time capabilities. (*Otero I*: Doc. 35-23, at 58-60).

• April 21, 2010:  Appeals Opinion by Dr. Alfred Parisi contained numerous references to Dr. Otero's part-time work schedule, and Dr. Parisi's conclusions focused on the issue of whether he was capable of performing full time sedentary work:   "R and L Supported for not to undertake full time sedentary work . . . .  In summary I cannot conclude with a reasonable degree of medical certainty that claimant would more likely than not function on a sustainable basis in a full time sedentary occupation which does not involve direct patient care responsibilities. . . .The basis for restricting claimant from full time sedentary work is the presumption that working full time would increase his stress to a level which would engender more frequent bouts of atrial fibrillation such that he could not sustain full time work on a regular basis.  That is the opinion of his AP cardiologist Dr. Hill and pointed out as a consideration to be weighed by his consulting electrophysiologist Dr. Kay.  I have no basis for refuting these opinions. . . .  Claimant has the physical capacity to undertake full time sedentary work.  Whether he would be limited in doing so by repeated bouts of atrial fibrillation is speculative." (*Otero I*: Doc. 35-23, at 70-75).

• April 30, 2010: Appeal Decision Letter to Dr. Otero from Robert Spellman referred to his part-time work status: "You have been working in the office setting four hours daily five

14

days per week seeing patients.  You have been allocating your work time each day from 9:00-11:00 am and again from 1:00-3:00 p.m."  The jobs that Unum found that  Dr. Otero could perform were "occupations [that] exist on a part-time basis."  Mr. Spellman stated in his letter that the specific jobs identified could be performed on a part-time basis while still generating the requisite income to meet the definition of gainful employment: the job of Insurance Physician and Medical File Review Physician would require his working "approximately 10-16 hours per week to be considered gainful" and the Peer Review Physician occupation would require his working "approximately 5.5-7.6 hours per week." (*Otero I*: Doc. 35-23, at 105).

In *Otero I* court filings in 2011 and 2012, Dr. Otero consistently took the position, with support from his cardiologists, that he was limited to working part-time.  The briefs and evidentiary submissions focused on Dr. Otero's alleged part-time work limitation and gainful employment options given that limitation.  No reasonable inferences existed from the evidence Dr. Otero produced or from Dr. Otero's briefs in that litigation that Dr. Otero planned to work more than the twenty hours per week; indeed, he claimed repeatedly that he could not. Unum did not specifically take the position that Dr. Otero could work full time, and the "other gainful employment" that it identified for him were all occupations that exist on a part-time basis. (*Otero I*: Otero's Br. Statement of Facts filed on 8/26/11 numbers 7, 12, 21, 32:; Doc. 24, at 4, 6, 8, 12; Unum's Resp. Doc. 31, at 3, 4, 6 with no dispute as to Dr. Otero's work schedule of 20 hours per week; Unum's Br. Doc. 27, at 3, at 5 ¶ 8, at 6 ¶ ¶ 11-13, at 7-8 ¶ 20, at 9 ¶ ¶ 25-27, at 10 ¶ 31, at 11 ¶ ¶  33-36, at 17, 19; Memorandum Decision Doc. 36, at 2, (entered 3/30/12 - "Dr. Otero cannot take night call or work 40 hours a week.  He currently works four days a week for four hours a day.")).

The record reflects that Dr. Otero's work schedule remained at approximately 20 hours per week from January 2010 forward, continuing throughout the pendency of *Otero I* and the claims period in *Otero II*.  He sees approximately six patients from 9:00 until 11:00 in the

morning and then six more from 1:00 until 3:00 in the afternoon with a two-hour break during

which he sits and reads or naps because he claimed to be unable to physically see patients for

four consecutive hours. Sometimes, he must cancel patients because of his symptoms. (*Otero II,*

Doc. 35-15, at 45-47).

*Dr. Otero's Premiums Paid During Period of Part-Time Work*

The administrative record in *Otero II* reflects that Neurology Consultants paid a

premium statement that Unum prepared monthly from Spring 2010 onward.  Neurology

Consultants provided Unum with information, called a census, about its employees covered

under the policy and the earnings that were covered.  The premium statement that Unum

prepared included "Employee Detail" sheets with a box individualized for each employee,

including Dr. Otero, listing in that box the employee's name, ID number, coverage amount

(representing his earnings for that month) and the monthly premium due for that employee based

on his earnings.

During the period that Unum paid disability benefits to Dr. Otero prior to the March 2010

termination, the Employee Detail sheets listed his name, but the premium listed was "0.00."

(*Otero II,* Doc. 35-13, at 66, 71, 74).  After the termination in early March 2010 of Dr. Otero's

disability benefits, Neurology Consultants did not simply add Dr. Otero's premium to the

statement without consulting Unum. To the contrary, as noted, in the weeks after the March 2010

decision, Dr. Otero and Neurology Consultants repeatedly contacted Unum, asking Unum

whether Dr. Otero needed to resume payment of premiums.

On April 2, 2010, Mr. Spellman of Unum specifically told Dr. Otero to resume paying

premiums.  (*Otero I*: Doc. 35-23, at 41).   On the April 2010 premium statement, the first

16

premium statement that Unum prepared for Neurology Consultants after the termination of his

disability benefits in March, Neurology Consultants wrote a note: "Please add Premium for

Arturo Otero $105.00." (*Otero II,* Doc. 35-13, at 75).  In the May 2010 premium statement

Unum prepared for Neurology Consultants, Dr. Otero's box in the Employee Detail sheet

changed the premium from $0.00 to $105.00.  (Doc. 35-13, at 82).  Therefore, each month Unum

produced a document that listed Dr. Otero's name and listed the premium due for him based on

his earnings, and Neurology Consultants continued to submit monthly premiums on Dr. Otero's

behalf based on his monthly earnings.  (*Otero II,* Doc. 35-2, at 2-3, ¶ 2; Doc. 35-12 (premium

statements) & 35-13 (premium statements)).

After Dr. Otero asked in March and April of 2010 whether he should resume premium

payments and Mr. Spellman told him to do so, Unum did not subsequently revisit the issue of

whether Dr. Otero was eligible for coverage under Neurology Consultants' group policy until

after he filed a new claim in September of 2013.  Unum explained that, given the millions of

employees insured under its group disability policies, Unum's practice is not to perform an

eligibility determination concerning whether an individual employee has coverage until that

employee submits a claim.

*Dr. Otero's Earnings at Neurology Consultants*

Part of the determination of disability rests upon Dr. Otero's earnings as a neurologist and

his condition's effect on those earnings. The administrative record of *Otero II* contains the

following specific information regarding Dr. Otero's earnings. The premium statements reflected

Dr. Otero's earnings of $6,250 per month from January 2010 through February 2012; earnings of

$4,167 per month from May of 2012[7] through January of 2013; earnings of $4,903 per month from February of 2013 through February of 2014; earnings of $4,220.00 per month for March and April of 2014.  (*Otero II:* Spellman Decl. Doc. 35-2, at 3 (stating that premiums are based on Dr. Otero's monthly earnings); Docs. 35-12 & 35-13 (premium statements with Dr. Otero's earnings and premiums based on those earnings)).

Although the parties have pointed the court to no documents in the *Otero I* and *II* administrative record showing Dr. Otero's W-2 or K-1 forms for 2010, 2011, and 2012, Unum presented the W-2 statements that Dr. Otero submitted to *Provident Life* in connection with his individual claim.  (*Otero II*, Doc. 25-4, at 2-8). As discussed subsequently, Provident Life is a sister company to Unum, and Dr. Otero had also purchased an individual disability policy with Provident Life and submitted a disability claim under that policy.  The W-2 statements that Dr. Otero submitted to Provident Life reflected that his wages for 2010 were $45,500.04, and that his wages for 2011 were $49,291.71.  *Id.*  For the year 2012, neither Unum nor Dr. Otero presented a W-2 form stating his income, but Unum presented Dr. Otero's employee pay stub for the pay period December 9, 2012 through December 22, 2012, which shows a salary year to date of $58,012.89 with a notation of "NCV Compensation"[8] of $819.00 for a total of $58,831,89, and net pay of $36,848.84.  (*Otero II*, Doc. 25-4, at 2-3 & 9).

Neither Unum nor Dr. Otero presented W-2 forms stating Dr. Otero's income for the

---

[7] The March and April of 2012 premium statements of Neurology Consultants in the *Otero II* administrative record do not reflect the salary of Dr. Otero.  Doc. 35-12, at 94-98.

[8] The record does not explain the term "NCV Compensation."

18

years 2013 and afterwards.[9]  Because Unum never processed Dr. Otero's disability claim for his

alleged disability beginning in February of 2013, which would require comparing his income

before and after the disability commencement date, it never requested information about his

earnings for that time period.

Calculating Dr. Otero's monthly earnings for the purposes of the policy does not include

income received from sources other than the employer.  (*Otero II*, Unum Br. Doc. 24, at 13-14

(undisp. fact 36)).

*Dr. Otero's 2013 Claim for Disability Benefits*

On September 6, 2013, over a year after the entry of judgment in Unum's favor in *Otero*

*I*, Dr. Otero submitted through his attorney a request to Unum's Benefits Center Coordinator that

the company find him disabled based on his current physical condition, which he characterized as

having deteriorated.  Dr. Otero also attached a list of over 50 companies, most of which were

insurance companies, that he claimed to have contacted unsuccessfully concerning employment;

Dr. Otero took the position that the jobs were unavailable to him "specifically because he is not

board certified." Dr. Otero's attorney made the following request:  "If UNUM continues to

maintain these jobs exist, would you please furnish the names of employers you can identify that

pay the amount of money that would disqualify Dr. Otero for disability benefits."  (*Otero II*, Doc.

35-6, at 1-19).  Dr. Otero's attorney also attached the medical records from Dr. Otero's February

2, 2013 emergency room visit documenting his heart problems.  (*Otero II,* Doc. 35-6, at 2-3 &

20-31).

---

[9] *Otero I*'s administrative record did contain a 2013 K-1 that shows a notation of  "338"
as nonseparately stated income; "442" in small business health insurance premiums; "1" in
interest income and "60" as qualified dividend income. (*Otero I,* Doc. 35-15, at 78-79).

Although Dr. Otero sent the September 2013 claim to *Unum*'s Benefits Center Coordinator in Columbia, South Carolina and referred in the body of the letter to the prior district court lawsuit involving the claim against *Unum* for group disability benefits, the paragraph of the letter marked "Re:" mistakenly referred to Provident Life and Accident Insurance Company as the company administering the claim.  Provident Life is a separate company administering Dr. Otero's *individual* disability policy, and the office administering that policy was a different office and in a different state than those handling Unum's claims. However, both Provident Life and Unum are sister companies under the umbrella of Unum Group.

In a letter dated September 17, 2013, Carol McCue, Director of Unum's Disability Benefits Center, responded to the September 6, 2013 claim, stating: "It is our understanding you are requesting a review of the denial made by Unum concerning Dr. Otero's long term disability claim 1794623.  At this time a copy of your letter and the attachments have been forwarded to the Appeals unit . . . ." (*Otero II,* Doc. 35-7).  Thus, although the September 2013 claim sent to Unum's Benefit Center improperly referenced Dr. Otero's Provident Life policy number, because the companies were related under the Unum Group umbrella, the mistake did not prevent the correct claims personnel from receiving it eventually; the September 2013 claim was forwarded to the correct recipient, Robert Spellman of Unum's Appeals department.

On September 17, 2013, Mr. Spellman responded: "Please understand this claim has been closed since 2010 and we cannot consider any additional information.  Also, your client's coverage ceased when he stopped working and therefore is unable to make a new claim." (*Otero II*, Doc. 35-9; 35-10, at 4).  Mr. Spellman did not refer to the appeal of the 2010 claims determination, which did not conclude until 2012; he provided no support for the incorrect

statement that Dr. Otero had stopped working; and he did not offer in that letter to return the

premium payments made on Dr. Otero's behalf during the three years that he had been working

part-time.

In a letter dated November 22, 2013, Dr. Otero's attorney responded, requesting a further

explanation:

> Is it the position of Unum that once a claim is denied that its insured can never
> file another claim for disability, even if his condition gets worse?

> As I described in my previous correspondence, Dr. Otero's health has continued
> to decline affecting his ability to work.  In fact, he is now awaiting admission to
> the hospital . . . .

> Please explain how his coverage ceased when he stopped work.  I am anxious to
> hear your explanation as my investigation reveals that he has continued to go
> into the office on a periodic basis and has continued to pay premiums.  If your
> investigation is different, please furnish me with the source so we can get to the
> bottom of who's telling the truth and who is not.

> I look forward to your prompt response and a detailed explanation of each and
> every fact relied upon by Unum to deny Dr. Otero's claim.

This letter has a stamp on it: "RECEIVED Dec 02 2013 BCCPORTAPPEALS," which appears

to reflect receipt at the Portland Appeals office in December of 2013.  (*Otero II,* Doc. 35-10, at

2-3).

Neither Mr. Spellman nor anyone else on behalf of Unum provided the requested

explanation; in fact, the company did not respond at all to the November 22, 2013 letter.

Spellman says the failure to respond was inadvertent, but provides no further explanation.

(*Otero II,* Doc. 35-2, at 6, ¶ 17).

On January 16, 2014, Dr. Otero's attorney made another attempt to obtain the information

about the investigation of Dr. Otero's new claim, sending a follow-up letter, and enclosing a copy

21

of his November 22, 2013 letter.  This letter has a stamp: "RECEIVED Jan 22 2014

BCCPORTAPPEALS."  (*Otero II,* Doc. 35-11, at 2).  Once again, Unum did not respond.

Despite the fact that the letter was correctly addressed to Mr. *Spellman* at *Unum*'s office in

Portland, *Maine* and had the correct *group* policy number plus a stamp that appears to state it was

received on January 22 at "BCCPORTAPPEALS,"  Mr. Spellman stated in his declaration that

someone, but not Spellman, imaged and misfiled the letter into Dr. Otero's *individual* disability

claim file administered by *Provident Life* in *Massachusetts*.  Mr. Spellman provided no

documentary support for that statement, such as records showing the sending of the letter to

Massachusetts or receipt of the letter in the Massachusetts center, a "RECEIVED" stamp for the

Massachusetts center, or testimony from staff at the Provident Life's benefits center

acknowledging that letter had somehow arrived there.  Further, the only "RECEIVED" stamp on

the letter appears to reflect that the Portland Appeals office received it on January 22, 2014.  Mr.

Spellman stated that no one in Provident Life's Massachusetts office forwarded the letter to him

or otherwise advised him of it, despite the fact that it was properly addressed to him and was

apparently stamped received in his office.  Mr. Spellman stated that he was not aware of the letter

until after Dr. Otero filed the instant suit.  (*Otero II,* Doc. 35-2, at 7, ¶ 19).

On April 3, 2014, Dr. Otero's attorney sent yet another letter not only to Mr. Spellman

but also to Unum's Executive Vice President/Chief Financial Officer, Chairman of the Board,

President/CEO, and Executive Vice President/Chief Operating officer.  This letter purportedly

enclosed a report from Dr. Otero's treating physician and proof of premium payments to Unum.

It also referred to previous, unanswered letters from the attorney to Unum, explaining that the

attorney was sending the current letter to Unum officials in addition to Mr. Spellman "in hopes

that each will respond to this letter because the claim department will not." This letter bears the

stamp "RECEIVED APR 07 2014 BCCPORTAPPEALS."  (*Otero II,* Doc. 35-12, at 2-3).

Spellman received the April 3 letter, and responded by letter dated April 9, 2014,

enclosing disability claim forms, and stating in relevant part as follows:

> This letter is in response to your most recent correspondence, dated April 3, 2014.
>
> We understand you are seeking to file a new disability claim.  Please have the enclosed disability claim forms completed by your client, his employer, and his treating physician.  We also have not received the report from Dr. Otero's physician that you reference in your letter.  Please forward a copy of that report to our office with the completed claim forms.
>
> Once this information is received, we will have The Benefits Center review it to see if your client meets the eligibility and disability requirements under the policy.

(*Otero II,* Doc. 35-14, at 2).  After Mr. Spellman discovered that the January 16, 2014 letter from

Dr. Otero's attorney had gone astray, the record did not reflect that Unum took any measures to

determine why the error had occurred or to ensure that it would not reoccur.

In a letter dated July 9, 2014, Dr. Otero's attorney returned the completed disability claim

forms and other 2013 and 2014 medical information from Dr. Otero's treating physicians.

(*Otero II*, Doc. 35-15, at 2-4).  Those records and the claim form  reflected that on February 2,

2013 and October 20, 2013, Dr. Otero underwent cardioversions to convert his atrial fib to sinus

rhythm, and that he was hospitalized in December of 2013.  The update from cardiologist Dr.

Jose Osorio stated:

> I have taken care of [Dr.] Otero for over a year now.  He has a [ ] history of chronice [sic] atrial fibrillation.  It has progressively gotten worse and he recently had to be hospitalized for implementation of a new medical therapy on December 4 and 5, 2013.  He will need to continue leading a non-stressfull [sic] life and work part-time in a non-stressful environment, preferably less stressful than what he works in now in order to help decrease the symptoms of his afib. . . .

(*Otero II,* Doc. 35-15, at 39).

In the July 9, 2014 letter, Dr. Otero's attorney disagreed with Unum's position that Dr. Otero could "earn the equivalent of his long term benefits performing other work, [as] Dr. Otero has been unable to obtain other work and none is available to him.  More significantly, Dr. Otero's condition has worsened and he has limited his practice even more. . . . I also request that you pay Dr. Otero his benefits from February 2013 when he met the definition for disability and submitted his claim."  (*Otero II,* Doc. 35-15, at 2-4).  Dr. Otero's attorney did not copy the CEO and President of Unum on this letter.  The July 9, 2014 letter attached the previous September 6, 2013 letter, which in turn had attachments.

According to Mr. Spellman, unbeknownst to him, the same misfiling error that occurred in January of 2014 reoccurred in July of 2014.  Once again, the July letter was properly addressed to Robert *Spellman* in *Unum*'s Portland, Maine office with the correct *group* policy number.  And, once again, according to Mr. Spellman, the letter and attachments were imaged and incorrectly placed in Dr. Otero's *individual* disability claim file with *Provident Life* in its *Massachusetts* office instead of properly placing it in his group disability claim file with Unum.  Again, the letter has a stamp marked "RECEIVED JUL 14 2014 BCCPORTAPPEALS," which appears to reflect receipt in the Portland Appeals office.  (*Otero II,* Doc. 35-15, at 2).  Mr. Spellman provided no documentation from Provident Life records or personnel to support his statement that the letter was misfiled in a Provident Life file, and the record does not reflect that Dr. Otero had any individual disability claim on appeal.   According to Mr. Spellman, Provident Life personnel did not send the misfiled letter to him despite the fact that it was addressed to him and stamped "received" in his office.  Mr. Spellman claims that he did not respond to the letter

and attachments because he did not receive them.  The record does not reflect that Mr. Spellman followed up with Dr. Otero in any way after his April 9, 2014 letter.

When Unum had failed to respond to his claim in any way over four months after his attorney submitted the claim form and supporting information, Dr. Otero filed the instant suit on November 20, 2104.  (*Otero II,* Doc. 1).

**B.  Policy Provisions**

Unum amended the group policy issued to Neurology Consultants effective April 1, 2005, and the amended policy applies to disabilities that start on or after the effective date.  (*Otero II*: Doc. 25-2, at 5).  Because the new claim made the basis of this suit asserted disability as of February of 2013, the group policy amendment effective April 1, 2005 would apply.[10]   The potentially relevant provisions of that policy are attached as an appendix to this Memorandum Opinion.

## IV.  STANDARD OF REVIEW

The Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, imposes minimum requirements for benefit claims procedures.  ERISA does not, however, "set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations."  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 108-09 (1989)

---

[10] If this claim represents a continuation of his disability beginning in 2005 that is treated as part of the 2005 claim, then the old policy language could be relevant.  *See* policy provisions defining "recurrent disability" (quoted on page 66 in the appendix to this opinion) and stating when a recurrent disability will be treated as part of the prior claim (quoted on pages 66-67 in the appendix to this opinion).  Because this court finds that this claim is not treated as a continuation of the 2005 claim, the April 2005 policy applies.  This amendment took effect after the beginning of his disability that was litigated in *Otero I*.  The court entered judgment in favor of Unum and against Dr. Otero on the claim based on termination of disability benefits as of March of 2010.

(internal citation and quotation marks omitted).

### A. *"De Novo"* or Arbitrary and Capricious

The proper standard of review in this case presents an unresolved question within the Eleventh Circuit.  The Supreme Court has provided some guidance.  It addressed the standard of review issue in the *Firestone* decision, holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.  Thus, in a normal case, "[w]hen reviewing a denial of benefits under ERISA, the scope of the district court's review hinges upon whether the ERISA plan granted the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *See Kirwan v. Marriott Corp.,* 10 F.3d 784, 788 (11th Cir. 1994).  If the ERISA plan included a grant of such discretion to the plan administrator and if the plan administrator makes a decision, then the district court reviews that decision under the arbitrary and capricious standard and may only consider "the facts known to the administrator" at the time of the decision.[11]   If, on the other hand, the ERISA plan does not grant the plan administrator

---

[11] For a court reviewing a plan administrator's benefits decision when the plan grants discretion, the Eleventh Circuit's standard of review follows these steps: "(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.  (2) If the administrator's decision in fact is '*de novo* wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.  (3) If the administrator's decision is '*de novo* wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).  (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.  (5) If there is no conflict, then end the inquiry and affirm the decision.  (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an

such discretion, then the district performs a *de novo* review and may examine facts not before the administrator.

The instant case does not follow the normal path because the plan granted the discretion to Unum *but Unum did not exercise it.*  The policy granted discretion to Unum:  "when making a benefits determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."  (Doc. 25-2, at 15).  *If* Unum had exercised its discretion and had made a decision on the claim, then the ruling in the *Firestone* decision would govern, and this court must accord deference to its discretionary determinations, including the decision on this claim.

However, both parties acknowledge that Unum did not respond to the letter submitting a claim for disability benefits beginning February of 2013, and never made a determination of his claim before Dr. Otero filed suit more than four months later.  Therefore, Unum did not follow ERISA claims-procedures on timely determinations on claims, which gives the plan administrator only 45 days to act on a claim, unless the administrator properly extends that time period.   29 C.F.R.   §§ 2560.503-1(f)(3),[12] 2560.503-1(g)(1).[13]

---

administrator's decision was arbitrary and capricious."  *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir. 2011).  In the first step, unlike the usual *de novo* review, the reviewing "court is limited to the facts as known to the administrator at the time the decision was made."  *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir. 2008); *see also Blake v. Union Camp Intern. Paper,* 622 F. App'x 853, 856 (11th Cir. 2015) (quoting *Glazer*'s language with approval and explaining that under the arbitrary and capricious standard of review, "the district court should limit discovery to the evidence that was before the plan administrator when it denied the claim for benefits.").

[12] "**Disability claims.**  In the case of a claim for disability benefits, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 45 days after receipt of the claim by the plan.  This period may be extended by the plan for up to 30 days, provided

Subsection (*l*) of 29 C.F.R. § 2560.503-1 states that when a plan fails to act on a claim within 45 days or to properly extend that claim, the claimant is deemed to have exhausted the plan's administrative remedies and may pursue other remedies, such as filing suit.  29 C.F.R. § 2560.503-1(*l*). Admittedly, subsection (*l*) says nothing about standards of review, and various courts have interpreted the silence in different ways.  The issue, then, is the appropriate standard of review in a "deemed exhausted" case where the plan accords discretion to the plan administrator but the administrator does not exercise it.

The Eleventh Circuit has acknowledged but refused to resolve this issue.  In *Torres v.*

---

that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 45-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision. . . ." 29 C.F.R. § 2560.603-1(f)(3).

[13] "**Manner and content of notification of benefit determination.  (1)** Except as provided in paragraph (g)(2) of this section [providing for oral communication of adverse benefit determinations involving urgent care], the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . .The notification shall set forth, in a manner calculated to be understood by the claimant - **(i)** The specific reason or reasons for the adverse determination; **(ii)** Reference to the specific plan provisions on which the determination is based; **(iii)** a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; **(iv)** A description of the plan's review procedures and time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review; **(v)** In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits, **(A)** If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or **(B)** If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit ....; **(vi)** [involves a claim involving urgent care].

28

*Pittston Co.,* the Eleventh Circuit reviewed a "deemed denial"[14] ERISA case, and acknowledged

a split in the Circuits regarding whether the "deemed denial" by an administrator with discretion

receives "de novo" review instead the more deferential standard:

> Some court have held that . . . a deemed denial receives no deference upon
> judicial review, since the plan administrator did not in fact exercise any
> discretion.  *See Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 631 (10th
> Cir. 2003)(holding that "when substantial violations of ERISA deadlines
> result in the claim's being automatically deemed denied on review, the
> district must review the denial *de novo*, even if the plan administrator has
> discretionary authority to decide claims."); *Jebian v. Hewlett Packard Co.,*
> 310 F.3d 1173 (9th Cir. 2002) (reviewing denial *de novo,* where the plan
> administrator did not issue decision until after deadline provided by plan
> had elapse, and more than a month after beneficiary filed suit); *Gritzer v.
> CBS, Inc.,* 275 F.3d 291 (3d Cir. 2002) (extending no deference to plan
> administrator's *post hoc* justification for denying benefits, issued only
> after commencement of litigation).  Others, however have held that the
> fact that the denial occurs by operation of ERISA regulations does not alter
> the otherwise-applicable standard of review.  *See McGarrah v. Hartford
> Life Ins. Co.,* 234 F.3d 1026 (8th Cir. 2000) (holding that ERISA plan
> fiduciary's failure to respond to beneficiary's request for administrative
> review does not trigger heightened scrutiny, absent showing of extreme
> procedural irregularities);[15] *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th

---

[14] Amendments to 29 C.F.R. § 2560.503 were effective January 20, 2001, but the
Department made those changes applicable prospectively to claims filed after January 1, 2002,
and thus, the amendments did not apply to Torres's claim.  The *Torres* opinion uses the "deemed
denied" language instead of the "deemed exhausted" language in subsection (*l*).  Among other
changes, the amendment changed the time in which the administrator must act from 90 days to
45 days and also modified the previous "deemed denial" provision to the subsection (*l*) language
quoted in this opinion.

[15] Within a few months of the Eleventh Circuit's opinion in *Torres*, the Eighth Circuit
entered the opinion of *Seman v. FMC Corp Ret. Plan for Hourly Emps.*, 334 F.3d 728, 733 (8th
Cir. 2003), which harmonized *McGarrah* with another case and determined the following:
"When a plan administrator fails to render any decision whatsoever on a participant's application
for benefits, it leaves the court with nothing to review under any standard of review, so the matter
must be sent back to the administrator for a decision.  When a plan administrator denies a
participant's initial application for benefits and the review panel fails to act on the participant's
properly filed appeal, the administrator's decision is subject to judicial review, and the standard
of review will be de novo rather than for abuse of discretion if the review panel's inaction raises

> Cir. 1988) (holding that, even though administrative review body failed to act on claimant's appeal of an initial denial, resulting in a deemed denial, the denial should be reviewed under the arbitrary-and-capricious standard, because "the standard of review is no different whether the appeal is actually denied or is deemed denied.").

346 F.3d 1324, 1332-33 (11th Cir. 2003) (*per curiam*); *see also Rasenack ex. rel. Tribolet, v. AIG Life Ins. Co.,* 585 F.3d 1311, 1315-18 (10th Cir. 2009) (following *Gilbertson* and finding that *de novo* review was appropriate; when "the remedies were 'deemed exhausted' by operation of law rather than the exercise of administrative discretion, [ ] *Firestone's* rule of deference does not apply."); *Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 109 (2d Cir. 2005) ("[W]e may give deferential review only to actual exercises of discretion."); *Pakovich v. Broadspire Servs.,Inc.,* 535 F.3d 601, 606 (7th Cir. 2008) (adopting the Eighth Circuit's rule set out in the *Seman* opinion, as discussed in fn 15 to this opinion, which held that when the plan administrator did not issue any decision, and thus, the district court had nothing to review, the district court must remand the case back to the administrator to make a decision).

However, the Eleventh Circuit in *Torres*, having referred to these conflicting positions, declined to adopt one. Because the district court in *Torres* had not addressed the "deemed denial" argument and because the resolution of that argument might have been "affected by the facts and circumstances," the Eleventh Circuit vacated the district court's decision, remanding the case so that the district court could first address whether the "deemed denied" argument further altered the standard of review. *Id.* at 1334; *see also White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008) (confirming that the Eleventh Circuit in *Torres* has not adopted any

---

serious doubts about the administrator's decision." Accordingly, the Eighth Circuit does not always apply the arbitrary and capricious standard to deemed exhausted cases where the plan afforded discretion to the administrator.

position on the standard of review in ERISA deemed denial cases where the administrator has discretion).

Given that the Eleventh Circuit has not resolved this issue,[16] the court returns to the regulation itself.   Although paragraph (*l*) does not specify a standard of review, the preamble to the regulation clarifies that, when a plan fails to comply with those minimum requirements, the plan's decision denying a claim should be entitled to no deference in court: the "Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections *should not be entitled to any judicial deference"* 65 Fed. Reg. at 70,255 (emphasis added).   If the court reads the regulation with the preamble, then the Department has interpreted its own regulation as saying that the  failure to follow the claims-procedure regulation entitles the claimant to have his claim reviewed *de novo* in federal court.

The court acknowledges that the Department's interpretation of its own regulation is not controlling if the language of the regulation is unambiguous.   *See Christensen v. Harris Cty.,* 529 U.S. 576, 588 (2000).   Yet, where ambiguity exists, the Department's interpretation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins,*

_____

[16] The court notes that, in an unpublished case, *Martinez-Claib v. Bus. Men's Assurance Co. of Am.,* 349 F. App'x 522, 524 (11th Cir. 2009), both the district court and the Eleventh Circuit Court of Appeals applied a *de novo* standard of review when the insurance company failed to act on an appeal within the required time period, and the inaction was deemed to be an implicit denial.   Both parties to that action agreed that the *de novo* standard was proper, so the Eleventh Circuit did not specifically address the issue of what standard of review applied.   In any event, the Eleventh Circuit provides by rule that it does not consider unpublished opinions to be binding precedent.   *See U.S. v. Bonner,* 712 F.2d 1418 (11th Cir. 1983) (citing Eleventh Circuit Rules, Rule 36-2, 28 U.S.C.A.).

519 U.S. 452, 461 (19997) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S.

332, 359 (1989)).   In a thorough, well-reasoned opinion analyzing the "timing, formality, and

history" of the preamble's interpretation, the Second Circuit Court of Appeal concluded that the

regulation in question was ambiguous and that "the Department's interpretation of its own

regulation as contained in the regulation's preamble is entitled to substantial deference . . . ."

*Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.,* 819 F.3d 42, 53-54 (2d Cir.

2016).

The Eleventh Circuit has not adopted the Labor Department's interpretation of its own

regulation— it has adopted no position—but it did confirm the Department's position in the

context of a "deemed denial" case: "The Labor Department has taken the position that a denial

occurring without the minimum procedural safeguards provided in the ERISA statutes and

regulations should not be reviewed deferentially."  *Torres,* 346 F.3d at 1333 n.11.  In a

subsequent decision, *White v. Coca-Cola Co.,* the Eleventh Circuit called the Department's

position "broad," but acknowledged that it had not adopted that position or any other; in any

event, that decision did not address a case involving administrative failure to exercise discretion,

and is not controlling here.  542 F.3d at 856.  Therefore, the Eleventh Circuit has provided *some*

direction by confirming that the Department of Labor had interpreted its own regulation as

finding that a court need not accord deference to a plan administrator's "deemed

denial/exhausted" decision, because it is a deemed decision, not an articulated one; the Eleventh

Circuit acknowledged both the split in the Circuits on this issue and its own refusal to take a

position on whether deference is due.

This court FINDS that the Department of Labor's subsection (*l*) is ambiguous regarding

32

the standard of review, as is perhaps obvious from the differing interpretations of it; and further FINDS that the Department has expressed its own reasonable interpretation in the preamble. Therefore, this court will not accord deference to Unum's "deemed exhausted" non-decision, unless the Department's interpretation is plainly erroneous or inconsistent with the regulation.

Subsection (*l*) states that a plan's failure to follow reasonable procedures in the regulation means that "a claimant shall be deemed to have exhausted the administrative remedies under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure *that would yield a decision* on the merits of the claim." 29 C.F.R. § 2560.508-1(*l*) (emphasis added). This court agrees with the Second Circuit that "[t]his language could be reasonably read as incorporating the logic of *Firestone* and its progeny that a claim is subject to *de novo* review if it is 'deemed denied,' the effective equivalent of being deemed exhausted under the 2000 regulation." *See Halo,* 819 F.3d at 54; *see also Torres,* 346 F.3d at 1332 n.10 (explaining that the revised regulations modified the "deemed denial" provision).

In addition, the court notes that the Secretary issued the preamble contemporaneously with the regulation, which demonstrates "the Secretary's intent at the time of the regulation's promulgation." *See Gardebring v. Jenkins,* 485 U.S. 415, 430 (1988). Further "the preamble [was] issued as part of a formal notice-and-comment rulemaking, formality that generally entitles an agency's interpretation to greater deference." *Halo,* 819 F.3d at 54. Finally, the explanation in the preamble is consistent with the regulation's history, which reflects that the Secretary issued the regulation as part of a system overhaul in recognition that ERISA plan administrators were failing to follow the regulation in addressing claims. 63 Fed. Reg. at

33

48,397.   Ultimately, the Department implemented subsection (*l*) with the "stated purpose ... to make clear that a decision made by a plan that did not establish or follow the regulation's minimum requirements 'is not entitled to the deference that would be accorded to a decision based upon a full and fair review that comports with the requirements of section 503 of the Act.'"  *Halo,* 819 F.3d at 55 (quoting 63 Fed. Reg at 48,397).

In light of this information, the court FINDS that the Department's interpretation of its own regulation set out in the regulation's preamble is consistent with the regulation and is not plainly erroneous; thus, the court determines that the Department's interpretation is entitled to substantial deference.  The court has also considered ERISA's dual statutory purposes: "'ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.'"  *Fifth Third Bancorp v. Dudenhoeffer,* ___U.S. ___, 134 S. Ct. 2459, 2470 (2014) (quoting *Conkright v. Frommert,* 559 U.S. 506, 517 (2010)).  The balance between these dual purposes is skewed if the plan administrator does not follow the claims procedures.

The Department explained in the preamble: "[i]nasmuch as the regulation makes substantial revisions in the severity of the standards imposed on plans, we believe that plans should be held to the articulated standards as representing the minimum regularity that warrants imposing an exhaustion requirement on claimants."  65 Fed. Reg. at 70,256.  Put another way, if plan administrators comply with the regulation, they receive the benefit of the exhaustion requirement and the deferential standard of review; if they do not comply, they lose the benefit of the deferential review, but still have to pay the claim only if it meritorious.  The court FINDS that this approach balances competing interests and that it is consistent with ERISA's dual purpose.  *See Halo,* 819 F.3d at 56 (finding that applying the *de novo* review under these

34

circumstances when a plan would otherwise be entitled to a discretionary review is consistent with ERISA's dual purposes).

Finally, the court notes Unum's argument that any deviation from claims procedures was inadvertent. (*Otero II,* Unum Br. Doc. 24, at 4, at 8 ¶ 19, at 9 ¶ 22; Doc. 34, at 6  ¶ 54, at 9 ¶ 14, at 11, at 21). In *Halo,* the Second Circuit pointed to the Department of Labor's own advice to plans that certain inadvertent and harmless deviations will not trigger *de novo* review:

> A plan that establishes procedures in full conformity with the regulation might, in processing a particular claim, inadvertently deviate from its procedures.  If the plan's procedures provide an opportunity to effectively remedy the inadvertent deviation without prejudice to the claimant through the internal appeal process or otherwise, then there ordinarily will not have been a failure to establish or follow reasonable procedures as contemplated by § 2560.503-1(*l*).

819 F.3d at 57 (quoting Dep't of Labor, FAQs About the Benefit Claims Procedure Regulation, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html).  Unum bears the burden of proof on the issue of whether the deviations were inadvertent *and* harmless, because the party claiming deferential review has the burden of proving the predicate that justifies such a review.  *Id.*  As the court will discuss more fully subsequently in this Memorandum Opinion, Unum failed to substantiate any claims of inadvertence and harmlessness.  For example, Unum asserted that it did not receive the mailed claim form and other documents that Dr. Otero's attorney submitted on multiple occasions when the mailed documents contained the proper address, when the stamp on them appears to reflect receipt by the correct office, and when, after supposedly being notified of an office delivery problem with the correctly addressed mail, Unum took no steps to correct it.  The court FINDS that Unum has failed to meet that burden.

For all of these reasons, the court FINDS that the *de novo* standard of review applies in

this case.  This court will not defer to a non-decision that occurred as the result of the mechanical expiration of time as opposed to the actual exercise of administrative discretion.

### B.  Which Documents?

Having determined that a *de novo* review is appropriate, the court must next address the dispute over which documents the court may consider in its review.  Obviously, the court may consider the documents that are part of the ERISA administrative record.  In *Otero I*, Unum argued successfully that the court's "determination can only be based on the record before the administrator at the time [ ] its decision was made."  Arguing that the evidence was outside *Otero I*'s administrative record, Unum filed a motion to strike evidence that jobs the Unum vocational expert identified as open to a doctor such as Dr. Otero were not in fact open to him as they required board certification and he is not board certified.  (*Otero I*, Unum's Br., Doc. 31, at 13-14 (citing *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir. 2008); *Townsend v. Delta Family-Care Disability & Survivorship Plan,* 295 F. App'x 971, 976 (11th Cir. 2008)). In the Memorandum Opinion, the court granted the motion to strike, and found, in the first step of the arbitrary and capricious standard of review, that the  review was limited to the administrative record and that the decision was not wrong.  (*Otero I*, Memo Op. Doc. 36, at 5).

Although Unum disagrees that a *de novo* review is appropriate in the instant case, both parties agree that, under a *de novo* standard of review with no deference accorded to the administrator's decision— as opposed to an arbitrary and capricious standard of review when the court gives deference to the administrator's decision—the court "is not limited to the facts available to the Administrator at the time of the determination."  *Kirwan v. Marriott Corp.,* 10 F.3d 784, 789 (11th Cir. 1994).

In its brief responding to Dr. Otero's argument in *Otero II*, Unum objected to factual paragraphs 34-37 and 39 and, as grounds, stated that these factual paragraphs are based on Exhibits 30-36 in *Otero I*, which the court excluded in *Otero I* because they were outside the administrative record.   In *Otero I*, which was *not* a "deemed exhausted" case, the court held that the arbitrary and capricious standard applied and that the court's review was "based on the facts known to the administrator at the time the decision was made."   Because Exhibits 30-36[17] were not available to the administrator at the time the decision was made in *Otero I*, the *Otero I* court struck those exhibits and could not consider the facts in paragraph 34-37, and 39 submitted in that case.   (*Otero I*, Memo. Op. Doc. 36, at 5; Order Doc. 37).   Dr. Otero submitted those same documents in this case. (*Otero II*, Pl.'s Br. Doc. 22, at 12, listing the same facts and documents struck in *Otero I* and contending that the documents are part of the Admin. Record in *Otero II*).

This court's review in the instant case, however, is a *de novo* review and is not limited to the administrative record.[18]   To the extent that Unum argues that this court's consideration of the

---

[17] In *Otero I*, Exhibits 30-33 were documents from the websites of two companies—Professional Disability Associates and Medical Director Solutions—that hired insurance physicians/medical file review physicians/peer review physicians and that Unum cited as examples of jobs that existed in the national economy providing earnings of $10,000 per month and that would be available to physicians such as Dr. Otero. Professional Disability Associates' Management and Office Support Team Biographies on its website, and Exhibit 34 was the information listed on PDA's website regarding its expert medical consultants.  Exhibit 35 was PDA's website regarding the companies involved with managing disability related products.  (*Otero I:* Doc. 25 at 64-76). Exhibit 36 was the Medical Director Solutions LLC website page stating minimum prerequisites for medical experts, including board certification. (*Otero I:* Doc. 25, at 77).  Dr. Otero presented this information in support of his motion for summary judgment, although it was not part of his claim file.

[18] The administrative record in *Otero II* would include stricken Exhibits 30-36 only if that administrative record included the entire *Otero I* court file.  Dr. Otero filed those exhibits to support his motion for summary judgment in *Otero I*, but they were not part of the *Otero I* administrative record, nor were they part of the materials that Dr. Otero's attorney submitted

stricken Exhibits 30-36—which are found in *Otero I*, Case No. 10-CV-2554, Doc. 25, at 64-

77—is precluded by *res judicata* and collateral estoppel, Unum is incorrect; given the different

standard of review, different administrative record, and different claim, those doctrines do not

necessarily preclude the court from considering Exhibits 30-36 in *Otero II* merely because the

court struck them in *Otero I*. This court FINDS that it may consider those documents to the

extent, if any, that they are relevant and material.  The determination hinges upon whether this

claim is treated as a continuation of the 2005 claim or as a separate claim, as discussed

subsequently.  Because the court treats this claim as separate from the claim in *Otero I* and

addresses this claim under the "regular occupation" standard, the court further FINDS that

Exhibits 30-36 relating to the other gainful occupations are not relevant and material to this

claim.

  The court further notes that, despite its argument that this court is limited to documents

that are part of the administrative record, Unum also presented documents that were part of Dr.

Otero's Provident Life claim file but were apparently *not* part of the administrative record for his

Unum claims: Dr. Otero's 2010 and 2011 W-2 forms and his employee pay stub for the pay

period December 9, 2012 through December 22, 2012.  Because this review is *de novo*, the court

will consider those documents as well as any relevant and material documents that Dr. Otero

offered that are outside the administrative record.

## V.  DISCUSSION

### A.  *Otero I Decision*

  As a preliminary matter, the court first makes this clarification: this case is not a review

directly to Unum to support the 2013 claim that forms the basis of *Otero II*.

of the decision in *Otero I.*  That decision found in March of 2012 that Unum's decision to deny

Dr. Otero's claim for long-term group disability benefits in March of 2010 was not *de novo*

wrong. This court accepts and applies that decision.

### *Res Judicata* and Issue Preclusion

Dr. Otero did not appeal *Otero I*, and that final judgment bars the claim that Dr. Otero

was disabled within the meaning of the Unum policy as of March 2010.  *Res judicata* applies to

bar a claim if four elements are present: "(1) there is a final judgment on the merits; (2) the

decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity

with them, are identical in both suits; and (4) the same cause of action is involved in both cases."

*Ragsdale v. Rubbermaid, Inc.* 193 F.3d 1235, 1238 (11th Cir. 1999); *see Langermann v. Dubbin,*

613 F. App'x 850, 853 (11th Cir. 2015) (citing *Ragsdale* and restating the elements).  The court

FINDS that the first three elements are present in the instant case.  The fourth element may be

present to the extent, if any, that this suit challenges the ruling that Dr. Otero was disabled as of

March 2010 or challenges his ability as of March of 2010 to perform the jobs the VE identified in

*Otero I; res judicata* bars any such challenges.

The Eleventh Circuit explained issue preclusion, also known as collateral estoppel,  as

follows: "If, however, the subsequent litigation arises from a different cause of action, the prior

judgment bars litigation only of 'those matters of issues common to both actions which were

either expressly or by necessary implication adjudicated in the first.'"  *In Re Justice Oaks II, Ltd.,*

898 F.2d 1544, 1549 n. 3 (11th Cir. 1990) (quoting 2 A Freeman, A Treatise of the Law of

Judgments § 677, at 1429-30 (5th ed. 1925)).  For issue preclusion to apply, the following

prerequisites must exist:

> (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,* 702 F.3d 1312, 1318 (11th Cir. 2012).

Whether denominated *res judicata* or issue preclusion, *Otero I* adjudicated the correctness of Unum's determination that Dr. Otero was not disabled according to Plan provisions *as of March of 2010* under the "gainful occupation standard." The court found that Unum's determination was not wrong, Dr. Otero did not appeal that determination, and the parties are now barred from contesting that issue. Because the instant suit cannot review the claim addressed in *Otero I,* the only claim addressed here is the claim for benefits *after* March 2010, which is Dr. Otero's claim asserting benefits for a disability beginning or recurring as of February 2, 2013. The court reviews that claim *de novo*.

In his briefs, Dr. Otero claims to accept that previous ruling, as he must. However, some of his arguments belie that acceptance and indicate that what he truly wants is for his claim for disability benefits as of February 2013 to be, in effect, a continuation of his earlier claim with supplemental evidence. For example, Dr. Otero points to his salary in 2005 as a measure of his pre-disability earnings, but 2015 was the beginning of his *first* period of disability which terminated in 2010 as affirmed by the court in *Otero I*, not the alleged beginning of disability at issue in *this* suit; he should point to his salary before February of 2013. As another example, Dr. Otero asserts that the court should apply the "any gainful occupation" standard and accept further evidence that he cannot perform other identified gainful occupations, but the policy provides that

40

for each new disability claim, the "regular occupation" standard will apply for the first two years of disability payments.  If Dr. Otero accepts the court's ruling that Unum's 2010 termination of disability payments under the first claim was not wrong, then those arguments make no sense; accepting the court's ruling means that the first disability terminated, and therefore, this disability claim is a new one instead of a continuation of the first terminated claim.  Dr. Otero's argument may stem from a misapplication or misunderstanding of the policy provision addressing recurrent disabilities, discussed later in this Memorandum Opinion.[19]  To the extent, however, that Dr. Otero asks this court to treat this claim for disability benefits as a continuation of the first terminated disability, he is refusing, in effect, to accept the *Otero I* ruling.  He must accept it, as must this court.

### B. *Otero II*: 2013 Claim of Disability

#### 1. Coverage under the Policy for the 2013 Claim

Unum argues that, because Dr. Otero's claim is for a new disability and not a continuation of the old within the policy definition, he was not covered under the policy in 2013; thus, any new claim for a second, separate disability beginning in 2013 should be denied.  Dr. Otero argues that this claim is for a recurrent disability the court should consider as part of his original claim, as the atrial fibrillation is the same condition that began in 2005 but worsened as of February 2013.  The court must first determine whether the claim was for a *new* disability,  a *recurrent* disability that the policy treats as a separate claim, or a *recurrent* disability that the policy treats as part of his prior claim.

---

[19] As discussed subsequently, the provision explaining when Unum will treat a disability as part of a prior claim does not apply to Dr. Otero's claim for disability beginning in February of 2013, because the 2013 disability did not occur within six months of the end of the prior claim.

Under the policy, a recurrent disability "means a disability which is:  caused by worsening in your condition; and due to the same cause(s) as your prior disability for which Unum made a Long Term Disability payment."  (*Otero II,* Doc. 25-2, at 37-40).  No dispute exists that the Dr. Otero's pre-March 2010 disability was based on his atrial fibrillation, and that this current claim is also based on atrial fibrillation, which Dr. Otero asserts worsened as of February of 2013, and he became disabled again.  Therefore, his atrial fibrillation is a *recurrent condition*, but whether it indeed falls within the definition of *disability*, the court will address subsequently.

However, even assuming *arguendo* that the atrial fibrillation falls within the policy term of recurrent disability, the policy does not treat all recurrent disabilities as part of the original disability claim.  The policy further provides that, "[i]f you have a recurrent disability, Unum will treat your disability as part of your prior claim and you will not have to complete another elimination period if:  you were continuously insured under the plan for the period between your prior claim and your recurrent disability; and your recurrent disability occurs within 6 months of the end of your prior claim." (*Otero II,* Doc. 25-2, at 26-27).

The six-month limitation prevents Dr. Otero's claim for disability as of February 2013 from being considered part of his prior claim.  No dispute exists about the following dates: Unum terminated Dr. Otero's disability benefits in March of 2010; the court in *Otero I* entered a judgment affirming that decision in March of 2012; and Dr. Otero's current claim is for a disability that occurred when his condition allegedly worsened as of February of 2013.  February of 2013 is *more* than six months after either of the dates that could possibly represent the end of the last claim:  March of 2010 or March of 2012.  Therefore, the court FINDS that the policy

42

treats this claim as a new disability claim, not part of the old one.

Dr. Otero argues that the last provision quoted does not apply because its heading reads: "WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME[20] AND YOUR DISABILITY OCCURS AGAIN?"  *Id.*  Because Dr. Otero never returned to work full time and he claims his disability never terminated, he asserts that this section does not apply to him. As Unum notes, however, the wording that Dr. Otero points to is in the title or heading, not the text of the provision.  "[T]he heading of a [contract's] section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt.  But they cannot undo or limit that which the text makes plain."  *Bhd. of RR Trainmen v. Baltimore & O.R. Co.,* 331 U.S. 519, 529 (1947) (internal citations omitted).  Although the Supreme Court specifically referenced statutory construction in this explanation, it "applies with equal force to the interpretation of contracts," including insurance policies.  *See Glenn v. Am. United Life Ins. Co.,* 2014 WL 3895429, at *9 n. 5 (N.D. Ala. Aug. 8, 2014) (using the quoted language and applying the *Bhd. of RR Trainmen* explanation to an insurance policy); *see also United States v. Leslie Salt Co.,* 350

---

[20]The use of the term "full time" makes sense because, as further discussed below, the policy only covers employees that work 36 hours per week or more, and, thus, are considered "full time."  In light of that coverage requirement, no policy provision exists that addresses the coverage of disability recurring after the employee returns to work less than 36 hours per week. Contrary to Dr. Otero's assumption, if the six month policy provision does *not* apply to meld the subsequent claim with the old one, then the subsequent disability claim is logically a new, separate claim. Without a provision specifically allowing the subsequent disability claim to be treated as part of the prior claim, the termination of the first disability separates one claim from the other and necessitates the treatment of the two claims as separate and distinct.  If the employee is working less than 36 hours per week at the time of the commencement of the subsequent disability and if that commencement occurs more than six months after the end of the prior claim, then no coverage would ordinarily exist for the new claim under the precise policy provisions because he would not be eligible.

43

U.S. 383, 389 (1956) (determining whether promissory notes were subject to documentary stamp taxes and stating that the "'essential characteristics' of the instruments controlled 'regardless of their descriptive caption.'").

The court FINDS the language of the provision itself to be unambiguous, and it need not consult the heading. Therefore, the current claim that Dr. Otero was disabled as of February of 2013, more than six months after the termination of his prior claim, means that the court treats this claim as a new disability claim under the terms of the policy, even though it is based on a recurrent condition.

### 2. Waiver or Estoppel

Unum argues that, as this claim for disability is a new one, no coverage exists under the policy, because, at the time the disability occurred in February of 2013, Dr. Otero was working less than the minimum of 36 hours per week required for coverage. Dr. Otero argues that even if he is not entitled to coverage under the precise terms of the policy itself, Unum is barred from relying on the 36 hour per week work requirement under equitable theories of waiver and estoppel. Those equitable arguments are based upon Unum's acceptance of his premiums for years after Unum knew he worked part-time. According to Dr. Otero, Unum knew that he worked less than 36 hours per week when it directed him to pay premiums and it accepted those premiums, and having retained the money with that knowledge, Unum may not now deny eligibility for coverage.

The court first acknowledges Unum's argument that Dr. Otero cannot raise these theories because he failed to plead them. In his complaint, Dr. Otero stated that he was covered by the policy and that he continued to pay premiums when he worked part-time after Unum terminated

his long-term disability benefits.  The other facts upon which waiver and estoppel are based are contained in Unum's own administrative record and could not represent a surprise to it.  In its own initial brief, Unum addressed, albeit briefly, the effect of the submission of those premiums, and presented an alternative argument that Dr. Otero did not qualify for disability benefits if the court determined that he was eligible for coverage.  Unum also addressed the theories of waiver and estoppel in its responsive brief.  Unum cites no legal authority for its argument that Dr. Otero may not rely on the theories of waiver and estoppel under these circumstances.  This court knows of no such authority and finds that Unum suffers no prejudice from Dr. Otero's reliance on them; accordingly, the court FINDS that Dr. Otero may raise the theories of waiver and estoppel, which it addresses separately below.

In the ERISA context, the Eleventh Circuit has recognized estoppel, but has not yet resolved the issue of whether waiver applies.  While ERISA preempts *state* law claims of waiver and estoppel, 29 U.S.C. § 1144(a), the ERISA statute itself does not specifically address whether the theories of waiver and estoppel under federal common law apply to actions brought under the statute.  "However, the statute has interstices, and the Supreme Court has noted that Congress expected, in passing the statute, for the federal courts to fill those gaps with 'a federal common law of rights and obligations under ERISA-regulated plans.'" *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir. 1994) (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56 (1987)).  To develop federal common law that fills in the ERISA gaps, a federal court "may use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying [ERISA]."  *See Nachwalter v. Christie*, 805 F.2d 956, 959-60 (11th Cir. 1986).  The Eleventh Circuit has recognized a "very narrow common law doctrine under ERISA

for *equitable estoppel"* but has "le[ft] open" whether *waiver* principles might apply to ERISA

actions. *Glass,* 33 F.3d at 1347 (emphasis supplied).

(a) Estoppel

Dr. Otero argues that estoppel bars Unum from relying on the 36 hour per week work

requirement as a basis for ineligibility. The Eleventh Circuit has crafted "a very narrow common

law doctrine under ERISA for equitable estoppel when (1) the provisions of the plan at issue are

ambiguous, and (2) representations are made which constitute an oral interpretation of the

ambiguity." *Glass,* 33 F.3d at 1347 (citing *Kane v. Aetna Life Ins.Co?,* 893 F.2d 1283, 1285-86

(11th Cir. 1990)). Estoppel does *not* apply "either for oral modifications (as opposed to

interpretations) or when the written plan is unambiguous." *Id.*

In the instant case, no party argues that the written policy is ambiguous as to the 36 hour

per week work eligibility requirement. Unum insists that the policy is unambiguous, and Dr.

Otero does not disagree, except as to the caption entitled "What Happens if You Return to Work

Full Time and Your Disability Occurs Again." The court does not find that the plan is

ambiguous as to the 36 hour eligibility requirement or the "What Happens . . . ." provision;

accordingly, the court FINDS that the narrow common law doctrine under ERISA for equitable

estoppel does not apply.

(b) Waiver

As noted, the issue of whether waiver principles apply in the ERISA context remains one

of first impression in the Eleventh Circuit. In *Glass v. United of Omaha Life Ins. Co.,* the

Eleventh Circuit considered the application of a waiver theory in the context of ERISA. It

defined waiver as "the voluntary, intentional relinquishment of a known right" and stated that

waiver is "a common law principle whose applicability under ERISA is an issue of first impression in this circuit." 33 F.3d at 1347.  The Court examined opinions from the Fifth and Seventh Circuits addressing this issue:  *Pitts v. Am. Sec. Life Ins. Co.,* 931 F.2d 351, 356-57 (5th Cir. 1991) and *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 647-50 (7th Cir. 1993), *abrogated, as to the 7th Circuit's test of estoppel, by Coker v. Trans World Airlines, Inc.,* 165 F.3d 579, 585 (7th Cir. 1999).

The Court agreed with the reasoning of the Seventh Circuit in *Thomason* that rejected the waiver argument but left open whether waiver principles might apply in an ERISA case under other circumstances.  *Glass,* 33 F.3d at 1348.   One example the Seventh Circuit gave of a circumstance when other courts had applied waiver was, as the Eleventh Circuit recounted, when "the insurance company was attempting to reap an unjust benefit, e.g., accepting premiums after the insurer's defense to coverage was known and clear, thus giving the insurance company the option of keeping the premiums if beneficial to it or at its option returning the premium and cancelling the policy when it was convenient to do so, *i.e.,* after a claim is made."  *Glass,* 33 F.3d at 1348 (recounting *Thomason,* 9 F.3d at 648 n. 3)*.*

Expressly agreeing with the Seventh Circuit's reasoning, the Eleventh Circuit in *Glass* rejected the plaintiff's waiver argument based on the factual circumstances before it.  In *Glass,* the defendant insurance company accepted premiums from a claimant whom the plan administrator erroneously included on the list of eligible employees.  However, the Court of Appeals found that the summary judgment record contained "no evidence that [the insurance company] attempted to unjustly enrich itself at the expense of an ineligible plan participant," and the defendant "attempted to return the few premium payment that it had accepted" immediately

47

upon realizing the error.   Rather, "the summary judgment record in [the *Glass* case] clearly shows that defendant did not know beyond doubt that Plaintiff was inactive (*i.e.* not actively at work) at the crucial time—when the plan and his coverage became effective."   Despite rejecting the waiver argument under those circumstances, the Court of Appeals left open whether waiver principles might apply in another ERISA case with different circumstances.   *Id.*

In *Witt v. Metropolitan Life Ins. Co.,* 772 F.3d 1269, 1279 (11th Cir. 2014), the Eleventh Circuit again addressed a waiver argument in the ERISA context*,* and stated that it had left open in *Glass* the question of whether waiver principles apply in the ERISA context.  However, because it found that the waiver argument failed in the facts before it, the Court of Appeals again chose not to decide whether waiver applied in the ERISA context.  One reason the waiver argument failed was that the plaintiff argued a "something-for-nothing" waiver claim; the plaintiff wanted the defendant to relinquish the benefit of the statute of limitations but had not given anything in return.  The Eleventh Circuit explained that it could not accept such a claim, and noted that the plaintiff had not given the defendant any premiums or any other benefit:

> Witt introduced no evidence that MetLife collected further premiums from Witt in 2009-2012 or received any consideration from Witt during that time.  While in *Glass* this Court left open the question of whether waiver might apply under the federal common law in the ERISA context, we rejected a "something-for-nothing" waiver claim where the defendant made a misrepresentation but did not attempt to receive an unjust benefit, such as premiums.

*Id.* at 1280.

Thus, although the Eleventh Circuit has not applied waiver in the ERISA context, it has left the door open to apply waiver when the plan administrator knows no coverage exists but received an unjust benefit such as premiums.  *See Glass,* 33 F.3d at 1348.

48

The instant case presents precisely that hypothetical scenario discussed in *Glass* and *Thomason.* Here, Unum specifically *told* Dr. Otero to resume paying premiums in 2010 to avoid a lapse in coverage when it knew he did not meet the minimum number of work hours to be eligible for coverage. It accepted those premiums for years, unjustly enriching itself with those payments, and only raised eligibility for coverage when Dr. Otero filed an additional claim for disability benefits. Apparently, it has never tendered repayment of those premiums.

Unum argues that it did not know Dr. Otero was working part-time and thus ineligible for coverage when it accepted his premiums, but the evidence contradicts that argument. The evidence does *not* reflect that Dr. Otero's employer unilaterally listed him as an eligible employee without input from Unum. Neither does the evidence reflect that Dr. Otero began making premium payments based upon the uninformed hope that coverage existed and that some equally uninformed Unum clerk accepted those payments with no idea that he was ineligible. Rather, the evidence reflects that Dr. Otero and his staff contacted Unum several times to ask specifically whether he should resume paying premiums in 2010. They received a specific answer from Unum and the answer was from Robert Spellman—not only a specialist in coverage issues but one of the two Unum employees who was most familiar with Dr. Otero's part-time work status. He was an "appeals specialist" who was tasked with reviewing coverage decisions, including reviewing on administrative appeal the termination of Dr. Otero's disability benefits in 2010, a decision he affirmed.

The content of Mr. Spellman's advice to Dr. Otero—that he should resume paying premiums to avoid a lapse in coverage—is not a disputed fact but is documented by Mr. Spellman's own note in the administrative record. During the days before and after he told Dr.

Otero to resume premium payments, Mr. Spellman received information that repeatedly referred to and focused on Dr. Otero's part-time work status; Mr. Spellman himself created documents in the administrative record during this time referring to Dr. Otero's part-time work status. The evidence reflects that Mr. Spellman knew and, thus, Unum knew, that Dr. Otero was working part-time when Mr. Spellman told Dr. Otero to resume premium payments.

The court acknowledges Unum's argument that Dr. Otero is charged with knowledge of the contents of his policy, and thus, knew he was ineligible for coverage from 2010 onward, when he was working part-time. As the court has found previously, Mr. Spellman and, thus, Unum, knew that Dr. Otero was working part-time when Mr. Spellman told Dr. Otero to resume premium payments in 2010. Therefore, Unum is arguing, in effect, that Dr. Otero is charged with greater knowledge of the policy's contents rendering him ineligible when he paid premiums, than Unum had of its coverage requirements rendering Dr. Otero ineligible when it asked for and accepted his premiums knowing Dr. Otero did not work 36 hours per week! This argument is disingenuous, and the court rejects it.

Unum also argues that the *errors* of Mr. Spellman and clerical staff cannot create coverage where none existed, and points to a policy provision stating that Unum's clerical error or omission by Unum will not cause an employee's coverage to begin or continue when the coverage would not otherwise be effective. In light of Mr. Spellman's position and his familiarity both with Dr. Otero's work status and with Unum's policy provisions, his *affirmative action* of advising Dr. Otero to pay premiums beginning in 2010 and the company's acceptance of those premiums from 2010 onward cannot reasonably be characterized as a clerical error or omission. The court also rejects that argument.

50

The court notes that, even when Mr. Spellman told Dr. Otero's attorney in 2013 that the doctor was ineligible for disability benefits, *he did not offer to return the premium payments*. If the company subsequently made that offer, the parties have not pointed this court to that offer in the very extensive record.

The court further notes that this scenario in the instant case falls outside the factual scenarios that the Eleventh Circuit has specifically found do *not* constitute waiver in ERISA cases. For example, in *Glass*, the Court of Appeals found that intentional waiver did not apply when the record clearly showed that the defendant insurance company did not know that the plaintiff was not actively at work, and thus, ineligible at the crucial time. *Glass,* 33 F.3d at 1348. Also in *Glass,* the Court found no evidence of any unjust benefit, noting that the insurance company promptly attempted to return the few premium payments it had accepted when it determined that the plaintiff was mistakenly included on the employer's eligibility list. *Id.* at 1348 & n.6.

In contrast to the fact situation in *Glass,* the evidence here reflected that Unum's acceptance of Dr. Otero's payment of premiums beginning in 2010 was not based on the uninformed mistake of his employer or Unum's clerical error, but instead was based on Mr. Spellman's specific direction to Dr. Otero to pay premiums despite knowing he was working part-time. Further, evidence exists here of unjust benefit to Unum, and the parties have pointed this court to no evidence that Unum has ever returned that unjust benefit.

The Eleventh Circuit has also explained that waiver would not apply to ERISA cases in which the plaintiff attempted to assert a "something-for-nothing" waiver "where the defendant made a misrepresentation but did not attempt to receive an unjust benefit, such as premiums."

*Witt,* 772 F.3d at 1280.  Again, in the instant case, Unum received the unjust benefit of premiums for *years*, so this situation does not fit into the rejected "something-for-nothing" scenario.

Although the Eleventh and Seventh Circuits have not yet applied waiver in the ERISA context, the Fifth Circuit has done so.  In *Pitts v. Am. Sec. Life Ins. Co.,* the Fifth Circuit recognized waiver as a viable theory under ERISA.  931 F.2d at 357. In that case, the group policy required a minimum number of employees to enroll before coverage would be effective, and the company did not have the requisite number.  However, the evidence reflected that the insurance company "accepted insurance premiums from [the employer] for five months after learning beyond all doubt that Pitts was the only employee remaining on the policy." *Id.*  It also had paid medical benefits under the policy without a reservation of its known rights.   Focusing on the "unilateral action of the insurer in failing to raise at the outset a known defense," the Court found that the insurance company had waived its right to assert that known defense in denying coverage and the Court affirmed the district court's finding the insurer liable for payment of benefits to the employee.  *Id.*

This court could apply the Fifth Circuit's reasoning in the instant case to find waiver here because Unum accepted premium payments on behalf of Dr. Otero for years while knowing beyond all doubt that he was working part-time and ineligible for coverage.  Indeed, here, Mr. Spellman of Unum not only knew about Dr. Otero's part-time work but he told Dr. Otero to pay premiums despite that knowledge.

Having determined that this fact situation fits the scenario that the Eleventh Circuit had proffered as one that might reasonably support waiver (and fits within scenarios accepted by

the Fifth Circuit and suggested as appropriate by the Seventh Circuit), this court FINDS that

waiver should apply.[21]  Dr. Otero adduced sufficient evidence of Unum's intentional

relinquishment of eligibility requirements of its plan that employees work at least 36 hours per

week when it unequivocally told Dr. Otero to pay premiums and it accepted those premiums

knowing that he was working less than 36 hours per week.  Similarly, this court concludes that

Dr. Otero adduced sufficient evidence that Unum unjustly retained years of premium payments

on Dr. Otero's behalf.  In sum, the court FINDS that Unum has waived its right to assert the

defense that Dr. Otero was not eligible for coverage after the termination of disability benefits

in March of 2010 because Dr. Otero was not working the minimum number of hours per week.

Unum presents no other basis for asserting that he was not eligible for coverage.  According,

the court FINDS that Dr. Otero was eligible for coverage.

### 3. Disability Based on Policy Terms

The court next turns to whether, as of February 2, 2013, Dr. Otero was disabled within

the meaning of the policy. As noted previously, based on policy provisions, the court cannot

treat Dr. Otero's claim as a continuation of his prior disability claim, but must treat it as a new,

---

[21] This court recognizes that some other Circuit Courts of Appeal have rejected waiver altogether in the ERISA context, or have refused to apply waiver in cases when doing so would expand the scope of coverage under an ERISA plan to an otherwise ineligible participant.  *See, e.g., Juliano v. Health Maint. Org. of N.J., Inc.,* 221 F.3d 279, 288 (2d Cir. 2000) (quoting *Albert J. Schiff Assocs., Inc. v. Flack,* 417 N.E. 2d 84, 87 (N.Y. 1980)) ("'where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable'")*; Lauder v. First UNUM Life Ins. Co.,* 284 F.3d 375, 282 (2d Cir. 2002) (distinguishing *Juliano* and applying the doctrine of waiver when it would not expand the coverage for which the plaintiff bargained and when the insurer possessed sufficient knowledge of the circumstances regarding disability as a defense); *White v. Provident Life & Accident Ins. Co.,* 114 F.3d 26, 29 (4th Cir. 1997) (holding that "the federal common law under ERISA . . . does not incorporate the principles of waiver and estoppel . . . . ERISA, however, does not provide for such unwritten modifications of ERISA plans.").

separate claim even though it arises from a recurrent condition.

As Unum acknowledges, the policy defines disability as follows:

**HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that:
–    you are **limited** from performing the **material and substantial duties**
of your **regular occupation** due to your **sickness** or **injury;** and
–    you have a 20% or more loss in your **indexed monthly earnings** due to
the same sickness or injury.

(*Otero II,* Doc. 25-2, at 19-20) (emphasis in original).

(a).  Regular Occupation

Unum first argues that Dr. Otero cannot meet the first element of this definition because

he has not provided evidence that, as of February 2, 2013 when his new disability allegedly

began, he was limited from performing the material and substantial duties of his regular

occupation as it existed when that disability began.  The court notes that Unum is not arguing

that the "any gainful occupation" definition applies to this new claim, but acknowledges that the

"regular occupation" definition quoted above applies.  The policy defines regular occupation as

meaning "the occupation you are routinely performing when your disability begins.  Unum will

look at your occupation as it is normally performed in the national economy instead of how the

work tasks are performed for a specific employer or at a specific location."  (*Otero II*, Doc. 25-2,

at 37-40).  To determine whether Dr. Otero is limited from performing the material and

substantial duties of his regular occupation of neurologist, this court should not look to how Dr.

Otero was performing his occupation at Neurological Consultants immediately before his

disability beginning in February of 2013, but rather, how the occupation of neurology is

performed in the national economy.

54

In support of its argument that Dr. Otero can perform the "material and substantial duties of [his] regular occupation," Unum presents one bare sentence: "There is no indication in the records submitted by Dr. Otero that he has been limited from performing the substantial and material duties of the occupation he was performing immediately before the February 2013 disability date." (*Otero II*, Unum Br. Doc. 24, at 23).   However, that statement is inaccurate.

The record reflects that, as of February of 2013, Dr. Otero was unable to perform the full duties of a neurologist as that job is performed in the national economy, because he is unable to work full time, and was unable to work more than 40 hours per week.  Catherine Rogers, Unum's Senior Vocational Consultant, found night call to be a substantial and material duty in the occupation of neurologist.  Another Unum Senior Vocational Rehabilitation Consultant, Shannon O'Kelley, found that night call could or could not be a substantial and material duty of the neurologist occupation, although a neurologist who did not take night call would expect decreased income.  (*Otero I,* Doc. 35-14, at 8, 12, 24).  Marilyn Howard of Unum stated in her note to Dr. Otero's claims file dated January 10, 2008 that "all statements indicate the insured would need to work over 40 hours per week to perform full duties."  (*Otero I,* Doc. 35-14, at 11-12).  The court FINDS that information in the administrative record reflects that performing the full duties of a neurologist as that position is performed in the national economy would require working over 40 hours per week.

The record further reflects that as of February of 2013, Dr. Otero's atrial fibrillation does not allow him to work over 40 hours per week.  The administrative record contains an opinion from Dr. Otero's current treating cardiologist, Dr. Osorio, stating that Dr. Otero's atrial fibrillation condition requires him to work part-time. In January of  2014, Dr. Osorio stated that

55

he had been treating Dr. Otero for over a year; that his condition had "progressively gotten worse"; and that Dr. Otero "will need to continue leading a non-stressfull [sic] life and work part-time in a non-stressful environment, preferably less stressful than what he works in now in order to help decrease the symptoms of his afib."  (*Otero I,* Doc. 35-15, at 39).  At the time of that opinion, Dr. Otero had been working a reduced schedule for a number of years with no night call and no hospital work.  He worked in the office only 16 hours per week, two hours in the morning four days a week, and two hours in the afternoon four days a week, with a rest period between the work blocks.  Even when he was working this part-time schedule in the office, Dr. Otero's heart problems were so serious that they required medical procedures and occasional hospitalization:  in 2013, he underwent two cardioversion procedures at different times of the year when his heart could not naturally establish a sinus rhythm, and was hospitalized in December of 2013 as he began a new medical therapy to treat that chronic condition.

The opinion of Dr. Hill, another of Otero's other treating cardiologists, also supports his inability to work full time as a neurologist, confirming that his abbreviated work schedule corresponded with the limitations that his chronic atrial fibrillation imposes.  Dr. Hill determined that Dr. Otero could not work full time as a neurologist, and explained the importance of limiting work hours and activities to avoid stress and sleep deprivation that can trigger atrial fibrillation. Dr. Hill characterized Dr. Otero's symptoms as "very severe and incapacitating to the point that he is unable to sustain any type of full time job. . . . [H]is clinical descriptions with his symptoms of weakness, shortness of breath, and inability to function during and after his episodes are quite consistent with the medical literature [and] there really is no question in my mind that based on the above, he is unable to carry on any meaningful sustained job."  (*Otero I,* Doc. 35-15, at 45-

47).

The record reflects that Unum often took the position that Dr. Otero could not perform the position of neurologist on a full time basis.  Unum determined twice, once in 2005 and again in 2007, that Dr. Otero was entitled to disability benefits because he could not perform his "regular occupation."[22]   Then, in 2010, Unum's own cardiology consultant agreed with Dr. Kay's restrictions on Dr. Otero regarding no night and weekend call, and no hospital work, which appears to support Dr. Oterio's inability to work over 40 hours per week.  (*Otero I,* Doc. 35-22, at 66).  In the April 2010 Appeal Decision, Mr. Spellman acknowledged that Unum's own consulting physician agreed with part-time work restrictions "based on the fact that full time work would increase your bouts of atrial fibrillation."  (*Otero I,* Doc. 35-23, at 105).   No evidence exists that Dr. Otero's condition has improved, and rather, he has presented unrefuted evidence from Dr. Osorio reflecting deterioration in his condition.

For all of these reasons, the court FINDS that, as of February 2, 2013, Dr. Otero has been limited from performing all of the material and substantial duties of his "regular occupation"of neurologist as that occupation is performed in the national economy.   He cannot work 40 hours per week, much less work over 40 hours weekly, cannot take night call or hospital calls, and working such hours would be part of the material and substantial duties of a neurologist.  Dr. Otero meets the first element of the disability determination set forth in his Unum policy as of

---

[22] The court recognizes that, although Unum did not qualify its reversal in its 2007 communication of that decision in its communication to Dr. Otero, its internal "Appeal Reversal" memorandum indicated that it would continue investigating Dr. Otero's entitlement to disability. However, after determining in 2007 that Dr. Otero was entitled to disability benefits under the "regular occupation" standard, Unum never determined otherwise; future decisions regarding entitlement to disability benefits were under the "gainful occupation" standard.

February of 2013.

(b).  20% Loss

The second element of the policy's definition of disability is that  Dr. Otero  suffered a 20% loss of indexed monthly earning based on his income from the three most recent years prior to his February 2013 claimed date of disability.  Unum argues that Dr. Otero cannot meet his burden to establish this element because no evidence of such a loss exists in the administrative record,[23] and because the evidence Unum presents outside the administrative record does not establish such a loss of monthly earnings.   (*Otero II,* Unum's Br. Doc. 24, at 23).   Under the policy in question, Dr. Otero's monthly income is determined by averaging his K-1 and W-2 income of the three most recent tax years just prior to the February 2013 claimed date of disability.  *Id.* at 19-20 (*see* provision quoted on page 65 in the appendix to this Memorandum Opinion).

Unum's administrative record contains no W-2 forms for the three years immediately preceding 2013 or W-2 forms for 2013 and afterwards.  Unum has supplemented the record with Dr. Otero's W-2 forms for the years 2010 and 2011, and his employee pay stub from Neurology Consultants for the pay period 12/9/12-12/22-12 that he submitted as part of his *Provident Life* individual claim. (*Otero II,* Doc. 25-4).  Given that this court's review is not limited to the administrative record, that supplement is helpful but not complete:  it contains no W-2 form for

_____

[23] Unum argues, on one hand, that this court's review is limited to its administrative record, an argument that this court has already rejected.  On the other hand, to support this particular argument, Unum has supplied documents that are not part of the combined *Otero I* and *II* administrative record:  the declaration of Nicole Johnson, an Unum Group senior dispute resolution consultant, attaching  Dr. Otero's W-2 forms for the years 2010 and 2011, and his employee pay stub from Neurology Consultants for the pay period 12/9/12-12/22-12 that he submitted under his individual policy with *Provident Life*. (*Otero II,* Doc. 25-4).

2012.  Because the policy purports to average the wages stated on the employee's W-2 forms for the three years preceding the disability date to obtain the monthly income—so, here 2010, 2011, and 2012—the court needs the information from 2012, too.

Dr. Otero provided no help on the 20% calculation, as his argument is based on the 2013 claim being a recurrent disability that harkens back to his pre-2005 income and not a new claim. The court has previously rejected that argument.

Obviously, Unum never required such documents from Dr. Otero, and made no such calculation during the claims process as it never addressed Dr. Otero's claim.  And, the calculations that it provides in the brief, but not in evidence, do not make sense without further clarification.[24]

In any event, Unum asserts that Dr. Otero has the burden of showing that he meets the Plan's definition of disability, including the 20% reduction in monthly earnings, and that he has failed to do so.  *See Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir. 1998) (*per curiam*) (Under ERISA, "the plaintiff bears the burden of proving his entitlement to contractual benefits.").  Dr. Otero  attempted to meet this element of the definition by presenting premium statements for 2010 through part of 2014, and those statements list his monthly salary;

---

[24] To cobble together the wage information needed to show that Dr. Otero has not shown a 20% reduction in income after February 2, 2013, Unum purported to add the W-2 wages for the twenty-four months of 2010 ($45,500.04) and 2011($49,291.71), which total $94,791.75, plus the 2012 pay stub wages (listing a salary of $58,012.89 plus NCV Compensation of $819.00 for a total compensation of $58,831.89 through 12/22/12).  The record does not explain what NCV Compensation is. Those numbers for the three years of 2010, 2011, and 2012 do not add up to the $164,144.64 total that Unum provides for those three years. (*Otero II*, Unum Br., Doc. 24, at 24).

to the extent that the monthly earnings on these statements do not coincide with the W-2 forms,[25] they do coincide with the premiums that Unum charged.

Those premium statements show that in 2010, 2011 and in the first two months of 2012, Dr. Otero earned $6,250 per month; that his earnings decreased later in 2012 to $4,167 per month; that his earnings for most of 2013 were $4,903 per month; and that his earnings decreased in 2014 to $4,220.00 per month.  The premium statements do not reflect Dr. Otero's earnings for the months of March and April of 2012.  The court acknowledges that, although these documents are not W-2 statements, they reflect a significant decrease in monthly earnings after February of 2013.  Depending on what Dr. Otero's earnings were during the missing months, they could show a 20% decrease in monthly earnings.  The court notes that, although the policy specifies that Unum should use earnings reflected on W-2 forms for a three-year period *prior to* the alleged disability date and average those to obtain monthly earnings, it does not specify what period *after* the alleged disability date Unum should use to determine post-disability monthly earnings.  The court further notes that Unum never required Dr. Otero's W-2 forms because it never considered the merits of his 2013 claim.

In the end, the court is left with W-2 forms for some but not all relevant years, premiums for most but not all of the relevant months which do not correlate with the earnings on the W-2

---

[25] The court also notes that comparing the wages on the premium statements to the wages on the W-2 forms, as Unum attempts to do, appears to be comparing apples and oranges: Dr. Otero's wages on the premium statements for 2010 and 2011 were significantly greater than the wages appearing on the W-2 forms for those years.  For example, the wages on the premium statements for 2010 and 2011 were $6,250 per month, which multiplies out to $75,000 per year, significantly higher than the yearly wages listed on the W-2 forms of $45,500.04 and $49,291.71, respectively.  The court is unsure about the reason for this discrepancy, but merely acknowledges that the discrepancy exists.

forms, and calculations that do not make sense.  While Dr. Otero could have done a better job of

providing the relevant documents, because Unum did not address his claim, did not provide a

basis for denying the claim, did not specifically request the W-2 forms, and did not clarify the

issues, his confusion about what documents were key is understandable.  Under these

circumstances, the court will not allow Unum to take unfair advantage of the confusion that it

created when the lack of information resulting from that confusion is remediable.

    In an ERISA benefits case, a court has discretion in fashioning a remedy on *de novo*

review.  Accordingly, the court WILL REMAND this claim to Unum, directing it to obtain the

relevant W-2 forms and any other relevant documents that it does not have and to make

appropriate calculations based on those W-2 forms to determine whether a 20% decrease in fact

exists in Dr. Otero's monthly earnings after February 2, 2013.

    The court has already determined that Unum has waived its right to challenge Dr. Otero's

eligibility for coverage based on his part-time work, and has already determined that Dr. Otero

has been unable, as of February of 2013, to perform his "regular occupation" of neurologist as

performed in the national economy.  Therefore, if the appropriate calculations reflect such a 20%

decrease in Dr. Otero's monthly income after February 2, 2013, then Unum shall pay Dr. Otero

long-term disability benefits based on his monthly earnings at the time he became disabled in

February of 2013; the court reiterates that as long as Dr. Otero otherwise meets the definition of

disability under the policy, Unum cannot raise his part-time work and failure to work the

minimum 36 hours per week to challenge his eligibility for coverage under the Plan.  The court

WILL RETAIN jurisdiction and WILL INSTRUCT Unum to determine Dr. Otero's claim at the

first level within 45 days of this opinion and to notify the court of the results.

Dated this 13th day of January, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

# APPENDIX

The following are some relevant or potentially relevant provisions of Dr. Otero's group long-term disability policy with Unum.

### 1. Administration

The amended policy provides that Neurology Consultants is the policyholder and the *plan* administrator, but that the *benefits* administrator is Unum. (*Otero II*, Doc. 25-2, at 6 & 31). Dr. Otero argues that Unum's acceptance of premium payments while it knew he was working 20 hours per week affects his coverage status. Unum points to the following policy provisions as relevant.

**WHAT INFORMATION DOES UNUM REQUIRE FROM THE POLICYHOLDER?**

The Policyholder must provide UNUM with the following on a regular basis:
– information about employees:
  • who are eligible to become insured;
  • whose amounts of coverage change; and/or
  • whose coverage ends;
– occupational information and any other information that may be required to manage a claim; and
– any other information that may be reasonably required.

Policyholder records that, in UNUM's opinion, have a bearing on this policy will be available for review by UNUM at any reasonable time.

Clerical error or omission by UNUM will not:
– prevent an employee from receiving coverage;
– affect the amount of an insured's coverage; or
– cause an employee's coverage to begin or continue when the coverage would not otherwise be effective.

(*Otero II,* Doc. 25-2, at 12-13).

**DOES YOUR EMPLOYER ACT AS YOUR AGENT OR UNUM'S AGENT?**

63

> For purposes of the policy, your Employer acts on its own behalf or as your agent.  Under no circumstances will your Employer be deemed the agent of Unum.

(*Otero II*, Doc. 25-2, at 18.

### 2. Eligibility for Coverage

Unum points to the following policy provisions as relevant to its assertion that Dr. Otero

was not eligible for coverage after the termination of his disability benefits in March 2010,

because he was not in active employment working the minimum number of hours per week.

> **ELIGIBLE GROUP(S):**
> Group 1
>     Owners in active employments
> Group 2
>     Physicians in active employment
> * * *
>
> **MINIMUM HOURS REQUIREMENT:**
>     Employees must be working at least 36 hours per week.

(*Otero II*, Doc. 25-2, at 8).

> **GENERAL PROVISIONS**
>
> **WHEN DOES YOUR COVERAGE END?**
>
> Your coverage under the policy or a plan ends on the earliest of:
> * * *
> –  the date you no longer are in an eligible group;
> * * * or
> –  the last day you are in active employment except as provided under the covered layoff or leave of absence provision.
>
> Unum will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

(*Otero II*, Doc. 25-2, at 17).

> **ACTIVE EMPLOYMENT** means you are working for your Employer for earnings that are paid regularly and that your are performing the

material and substantial duties of your regular occupation.  You must be
working at least the minimum number of hours as described under
Eligible Group(s) in each plan.

(*Otero II*, Doc. 25-2, at 37).

### 3. Disability Benefits

Unum points to the following provisions as relevant to and supportive of its assertion that

Dr. Otero was not disabled as of February of 2013:

**HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that:
–     you are **limited** from performing the **material and substantial duties**
of your **regular occupation** due to your **sickness** or **injury;** and
–     you have a 20% or more loss in your **indexed monthly earnings** due
to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines
that due to the same sickness or injury, you are unable to perform the
duties of any **gainful occupation** for which you are reasonably fitted by
education, training or experience.

We may require you to be examined by a physician, other medical
practitioner or vocational expert of our choice.  Unum will pay for this
examination.  We can require an examination as often as it is reasonable to
do so.  We may also require you to be interviewed by an authorized Unum
Representative.

(*Otero II,* Doc. 25-2, at 19) (emphasis in original).

**HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED?**

We will follow this process to figure out payment:

**Owners, Physicians**
1.  Multiply your monthly earnings by 60%.
2.  The maximum **monthly benefit** is $10,000.
3.  Compare the answer from Item 1 with the maximum monthly benefit.
The lesser of these two amounts is your **gross disability payment**.

(*Otero II,* Doc. 25-2, at 19-20) (emphasis in original).

**WHAT ARE YOUR MONTHLY EARNINGS?**
\*\*\*
**Physicians, All Other Full-Time Employees**
"Monthly Earnings" means your gross monthly income from your
Employer in effect just prior to your date of disability and is computed
based on your Schedule K-1 and W-2 income averaged over the lesser of:
a.  the 3 most recent tax years (36 months); or
\*\*\*
W-2 income is derived from the income box on your W-2 form that
reflects "wages, tips and other compensation" received from your
Employer.  It is your total income before taxes.  It is prior to any
deductions made for pre-tax contributions to a qualified deferred
compensation plan.

It does not include . . .  income received from sources other than your
Employer.

(*Otero II*, Doc. 25-2, at 20) (emphasis in original).

> **ELIMINATION PERIOD** means a period of continuous disability
> which must be satisfied before you are eligible to receive benefits from
> Unum.
>
> **INDEXED MONTHLY EARNINGS** means your monthly earnings
> adjusted on each anniversary of benefit payments by the lesser of 10% or
> the current annual percentage increase in the Consumer Price Index.
> Your indexed monthly earnings may increase or remain the same, but
> will never decrease.
> \* \* \*
> Indexing is only used to determine your percentage of lost earnings
> while you are disabled and working.
>
> **GAINFUL OCCUPATION** means an occupation that is or can be
> expected to provide you with an income at least equal to your gross
> disability payment within 12 months of your return to work.
>
> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that:
> –   are normally required for the performance of your regular
> occupation; and
> –   cannot be reasonably omitted or modified.
>
> **RECURRENT DISABILITY** means a disability which is:

66

– caused by worsening in your condition; and
– due to the same cause(s) as your prior disability for which Unum made a Long Term Disability payment.

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**SICKNESS** means an illness or disease.  Disability must begin while you are covered under the plan.

(*Otero II*, Doc. 25-2, at 37-40).

**WHEN WILL PAYMENTS STOP?**

We will stop sending you payments and your claim will end on the earliest of the following:

– during the first 24 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
– after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
– the end of the maximum period of payment;
– the date you are no longer disabled under the terms of the plan;
– the date you fail to submit proof of continuing disability;
– the date your disability earnings exceed the amount allowable under the plan;
– the date you die.

(*Otero II*, Doc. 25-2, at 25) (emphasis in original).

**WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME AND YOUR DISABILITY OCCURS AGAIN?**

If you have a **recurrent disability,** Unum will treat your disability as part of your prior claim and you will not have to complete another elimination period if:
– you were continuously insured under the plan for the period between your prior claim and your recurrent disability; and
– your recurrent disability occurs within 6 months of the end of your prior claim.

Your recurrent disability will be subject to the same terms of this plan as your prior claim.

Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim.  The new claim will be subject to all of the policy provisions.

(*Otero II*, Doc. 25-2, at 26-27) (emphasis in original).

### 4.  Claims Procedures

Unum will give you notice of the decision no later than 45 days after the claim is filed.  This time period may be extended twice by 30 days if Unum both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies you of the circumstances requiring the extension of time and the date which Unum expects to render a decision . . . .

If your claim for benefits is wholly or partially denied, the notice of adverse benefit determination under the Plan will:
- state the specific reason(s) for the determination;
- reference specific Plan provision(s) on which the determination is based;
- describe additional material or information necessary to complete the claim and why such information is necessary;
-  describe Plan procedures and time limits for appealing the determination, and your right to obtain information about those procedures and the right to sue in federal court; and
-  disclose any internal rule, guidelines, protocol or simlar criterion relied on in making the adverse determination (or state that such information will be provided free of charge upon request).

Notice of the determination may be provided in written or electronic form.  Electronic notices will be provided in a form that complies with any applicable legal requirements.

 (*Otero II,* Doc. 25-2, at 33).

### 5.  Discretion

When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

(*Otero II*, Doc. 25-2, at 15).